[No. A021137. First Dist., Div. Two. May 24, 1984.]

SEVERO PASILLAS, Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO et al.,
Real Parties in Interest.

[And four other cases.]*

*United Farm Workers of America v. Agricultural Labor Relations Board (Nos. A021199, A021200 and A022544); Navarro v. Agricultural Labor Relations Board (No. A021202).

316

COUNSEL

A. Roger Jeanson, Haas & Najarian, Robert F. Gore, Rex H. Reed, Rossie D. Alston, Jr., Dianna Lyons, Federico G. Chavez, Daniel A. Garcia, Wendy Sones, Ronald A. Zumbrun and Robin L. Rivett for Petitioners and for Real Parties in Interest.

Manuel M. Medeiros, Daniel G. Stone and Cathy Christian for Respondent.

OPINION

SMITH, J.—In these consolidated cases, we consider the extent of a union's authority under the Agricultural Labor Relations Act (Lab. Code, § 1140 et seq., hereinafter ALRA or the Act)[1] to compel a worker's discharge from employment, pursuant to a "union security" provision of a collective bargaining agreement, for the worker's failure to maintain union membership in good standing. We granted the petitions of Severo Pasillas, Maria Navarro and the United Farm Workers of America (UFW or Union) to review the decisions of the Agricultural Labor Relations Board (ALRB or Board) in three related cases arising out of the Union's suspension or expulsion of four member workers for crossing picket lines to work during 1979 strikes called after expiration of prior collective bargaining agreements but before new agreements had been reached. Pursuant to union security provisions in the new agreements, the workers were fired by their employers at Union request.

BACKGROUND

Petitioners Pasillas and Navarro, along with two other workers, Juan Martinez and Odis Scarbrough, were all UFW members in good standing and were working for employers who were parties to collective bargaining agreements containing union security provisions. In December of 1978,

---

[1] All subsequent section references are to the Act unless otherwise indicated.

those agreements expired without new agreements having been reached.[2] Navarro worked as a lettuce wrapper for Growers Exchange, Inc. (sometimes called the El Toro Company); Martinez worked as a broccoli cutter for Mann Packing Company, Inc.; and Scarbrough worked as a tractor driver for Sun Harvest, Inc. (formerly InterHarvest, Inc.), which was also Pasillas' most recent employer. (See fn. 2, *ante*.)

In January 1979, the UFW called strikes at Sun Harvest, Inc. (Sun Harvest) and Growers Exchange, Inc. (Growers Exchange). There were occasional work stoppages at Mann Packing Company, Inc. (Mann Packing), Martinez's employer, but no formal strike was called. Pasillas, Navarro and Scarbrough each initially respected the strikes but later crossed picket lines and returned to work before the strikes were settled. Martinez joined in all work stoppages at Mann Packing but was later accused of having crossed picket lines to work at Growers Exchange. None of the workers sought to resign from union membership.

The strikes against Sun Harvest and Growers Exchange were settled, and new collective bargaining agreements were signed with all three employers (including Mann Packing) in September and December of 1979. Each new agreement contained a union security provision which conditioned a worker's employment on his maintaining union membership in good standing.[3] The four workers continued working for their respective employers after the new contracts took effect.

Thereafter, each worker was charged with violating union prohibitions against strikebreaking[4] and each was found guilty as charged in separate

---

[2]Petitioner Pasillas, who had been working as a celery packer for Sun Harvest, Inc., elected not to travel south for the company's Oxnard celery season and so was not employed beyond the end of the Salinas celery season, which lasts from June to December.

[3]The three union security provisions are nearly identical. The one in the Sun Harvest agreement reads as follows: "Union membership shall be a condition of employment. Each worker shall be required to become a member of Union immediately following five (5) continual days after the beginning of employment, or five (5) days from the date of the signing of this Agreement, whichever is later; and to remain a member of the Union in good standing. Union shall be the sole judge of the good standing of its members. Any worker who fails to become a member of the Union within the time limit set forth herein, or who fails to pay the required initiation fee, periodic dues or regularly authorized assessments as prescribed by Union, or who has been determined to be in bad standing by the Union pursuant to the provisions of the Union's constitution, shall be immediately discharged or suspended upon written notice from the Union to the Company [Sun Harvest], and shall not be re-employed until written notice from the Union to the Company of the worker's good standing status."

[4]Each was charged under the following sections of the UFW's Constitution (UFW Constitution), article XVIII:

"Section 1: Any member of the Union may prefer charges against any other member of

disciplinary proceedings. The discipline imposed was a two-year suspension of Navarro's membership and outright expulsion for the others. By successful internal appeals to the UFW's national executive board (NEB), Scarbrough and Martinez had their expulsions reduced to two-year and one-year suspensions, respectively. An attempted appeal by Navarro was rejected by the NEB as untimely, and Pasillas did not file an appeal. Following each worker's suspension or expulsion—and NEB appeal, if any—notice of each worker's "bad standing" was given to his or her employer, and the workers were thereupon terminated from employment pursuant to the union security provisions in the new collective bargaining agreements.

Only Scarbrough proceeded to the next internal union appeal level, the public review board (PRB).[5] Finding that the Union had failed to demonstrate the membership of persons voting at Scarbrough's trial and had failed to provide a complete trial record, the PRB overturned both the trial and NEB decisions and restored Scarbrough to full union membership. Due to delay caused largely by the apparent loss of Scarbrough's first PRB appeal notice filed in May 1980, the PRB decision and Scarbrough's subsequent reinstatement did not occur until May 1981.

Meanwhile, Scarbrough and the other workers each challenged his or her discharge by filing unfair labor practice charges against the Union (§ 1154, subds. (a)(1) and (b)). Pasillas and Martinez filed charges against their employers as well (§ 1153, subds. (a) and (c)). The Board ordered the charges of Pasillas, Scarbrough and Martinez consolidated, and Navarro's case proceeded separately.

Hearings on the consolidated cases were held in April of 1981 before an administrative law judge (ALJ), and the ALJ's written decision was filed on

---

the Union for:
" . . . . . . . . . . . . . . . . . . . .
"(b) violating any provision of this Constitution;
" . . . . . . . . . . . . . . . . . . . .
"(dd) working without Union authorization during the period of an approved strike for a Ranch which is being struck by the Union;
"(ee) crossing an authorized Union picket line; . . ."
We additionally note that article XVII of the UFW Constitution, delineating obligations of membership, provides in section 4 that "Every member shall respect Union picket lines, for there is nothing lower than a strikebreaker."

[5] An appeal from a trial resulting in any disciplinary action lies to the NEB if taken within 15 days of the date of trial (or longer if the NEB determines that the interests of justice are served by an extension of up to 30 days). An NEB appeal stays enforcement of penalties pending its resolution. (UFW Const., art. XX, §§ 1(a), 1(b), 1(d).) In cases involving suspension or expulsion where the NEB upholds the trial action, further review is available by appeal to either the PRB or the first Convention following the NEB decision. Unlike the NEB appeal, however, this further review does not stay the suspension or expulsion. (UFW Const., art. XX, § 2.)

the following October 9th. The ALJ concluded that, although the Union had power to suspend and hence cause the discharge of its members for strikebreaking, each charging party had been denied due process in the course of the disciplinary proceedings. The discharges were therefore held improper and all unfair labor practice charges were sustained. The ALJ ordered makewhole remedies, retroactive union membership in good standing and immediate offers of reinstatement for all charging parties.

On May 4, 1982, at a prehearing conference before an ALJ in Navarro's case, both sides waived an ALJ hearing and submitted the matter directly to the Board on stipulated facts and certain other documentary evidence, pursuant to Board regulation. (Cal. Admin. Code, tit. 8, § 20260.)

Board review of the ALJ decision in the consolidated cases of Pasillas, Scarbrough and Martinez culminated in a decision and order dated December 30, 1982. A majority of the Board upheld the ALJ's disposition as to Martinez, concluding that he was denied a fair hearing.[6] As to Scarbrough, the Board agreed with the ALJ that a September 1979 layoff caused by the Union constituted a violation of the Act. However, the Board dismissed allegations concerning his subsequent January 1980 discharge from employment in light of remedial actions already taken by the Union and declined to maintain jurisdiction over the matter. Portions of the consolidated complaint relating to Pasillas were dismissed by the Board for his failure to adequately exhaust internal union procedures.[7]

By a supplemental decision and order of April 15, 1983 (9 A.L.R.B. No. 17), the Board modified its prior decision as to Scarbrough after granting his motion for reconsideration. The Board reversed its position on the January 1980 discharge and accordingly issued a remedial order. Noting that Scarbrough had recently died, the Board ordered his estate entitled to backpay.

The Board issued its decision in Navarro's case (8 A.L.R.B. No. 104) on December 30, 1982, the same day as its decision in the consolidated cases. Concluding that the strikebreaking charges against Navarro were preferred well beyond the 60-day time period specified in the UFW Constitution (art. XVIII, § 4) and that extensions of time authorized by UFW President Cesar

---

[6]Board member Jerome Waldie, finding no procedural due process violations as to Martinez, would have dismissed those allegations.

[7]Board member John McCarthy dissented and evidently would have found violations of the Act as to all charging parties. He felt that, where the charge against a union member was strikebreaking, any discipline resulting in suspension or expulsion, and consequent loss of employment under a union security provision, was invalid where less restrictive disciplinary action would be effective in promoting union solidarity.

Chavez were ineffectual, the Board found a violation of Navarro's right to due process in the disciplinary proceedings and, due to the gravity of the violation, excused her failure to exhaust internal union procedures. The Board ordered retroactive restoration of union membership and reinstatement to employment, plus make-whole remedies.

On January 28 and 31, 1983, timely petitions were filed for review of the Board's two December 30, 1982 decisions. Pasillas and Navarro each petitioned in their respective cases, and the Union cross-petitioned in both cases (8 A.L.R.B. No. 103, 8 A.L.R.B. No. 104). Neither Martinez nor representatives of Scarbrough sought review. On May 16, the Union petitioned for review of the Board's supplemental decision of April 15, 1983 (9 A.L.R.B. No. 17). (§ 1160.8.) We denied respondent Board's motion to dismiss Navarro's petition (see fn. 12, *post*). The five petitions were consolidated for review; we issued writs of review on January 18 and 26, 1984.

REVIEW

I

Preliminary to addressing several of the various issues presented herein, it is important to examine the language and history of the Act as it relates to the use of union security provisions.

The ALRA was enacted in 1975 to fill a long-standing void left by the National Labor Relations Act (NLRA) (29 U.S.C. § 151 et seq.),[8] which expressly excludes agricultural laborers from its definition of "employees." (NLRA, § 2(3) [29 U.S.C. § 152(3)].) Our state Supreme Court has noted: "[T]he entire ALRA is designed to provide agricultural workers with protection of their collective bargaining rights comparable to that provided nonagricultural workers by the NLRA. To that end the ALRA was patterned after the NLRA, with changes necessary to meet special needs of California agriculture. [Citation.] . . . [¶] The Legislature thus intended to adapt to California needs the proved federal instrumentality for protecting rights of employees and employers with respect to collective bargaining. [Citation.]" (*Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 345 [156 Cal.Rptr. 1, 595 P.2d 579]; see generally, Levy, *The Agricultural Labor Relations Act of 1975—La Esperanza de California Para El Futuro* (1975) 15 Santa Clara L.Rev. 783 [hereinafter cited

---

[8]Originally enacted in 1935 and commonly known as the Wagner Act, the NLRA, as amended in 1947 (Taft-Hartley Act), is now incorporated as part of the Labor-Management Relations Act (LMRA) (29 U.S.C. § 141 et seq.) but continues to be cited as the NLRA. (29 U.S.C. § 167.) This opinion will at times refer to the original section numbering of the NLRA but with parallel citation to the United States Code.

as Levy].) That intent is clear from the Act itself, section 1148 of which directs that "[t]he board shall follow applicable precedents of the [NLRA], as amended." State courts similarly will "look to established administrative and judicial interpretations of the federal act as persuasive indicants of the appropriate interpretation of the state legislation. [Citations.]" (*Highland Ranch* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 848, 855-856 [176 Cal.Rptr. 753, 633 P.2d 949].)

 Both the state and federal acts permit union security agreements which require membership in a labor organization as a condition of continued employment.

The ALRA borrows word for word from the NLRA in, first, declaring expansive rights of employees to freely organize and participate in concerted activity directed at collective bargaining and, then, declaring a converse right to disassociate from such activities—but subject to the effect of union security agreements authorized by the Act.

Section 1152 provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities *except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of continued employment* as authorized in subdivision (c) of Section 1153." (Italics added.) Thus the section announces two complementary rights, one to associate and one to disassociate with concerted activities aimed at collective bargaining. It is apparent from the italicized language—its use of the word "right" in the singular and its position immediately following the announced right to *refrain* from concerted activities—that an authorized agreement conditioning continued employment on union membership is expected to adversely affect the *dis*associational right.

Again following the federal model, the ALRA states in section 1153: "It shall be an unfair labor practice for an agricultural employer to do any of the following: [¶] (a) To interfere with, restrain, or coerce agricultural employees in the exercise of the rights guaranteed in Section 1152. . . . [¶] (c) By discrimination in regard to the hiring or tenure of employment, or any term or condition of employment, to encourage or discourage membership in any labor organization." Subdivision (c) of section 1153 continues, in part: "Nothing in this part,[9] or in any other statute of this state, shall

---

9The Act comprises part 3.5 of division 2 of the Labor Code.

preclude an agricultural employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this section as an unfair labor practice) to require as a condition of employment, membership therein on or after the fifth day following the beginning of such employment, or the effective date of such agreement whichever is later, . . ."

■ Therefore, in defining what actions of an agricultural employer will constitute unfair labor practices, section 1153 carves out an exception for certain actions taken pursuant to an authorized union security agreement. Section 1154, defining what actions of a *labor organization* constitute unfair labor practices, similarly leaves room for the effects of such an agreement.[10]

With minor drafting differences, the federal act operates in much the same way. It declares the identical associational rights plus the disassociational right made subject to authorized union security agreements. (29 U.S.C. § 157 [formerly NLRA § 7].) It also defines unfair labor practices for both employers and labor organizations so as to accommodate the effects of such agreements. (29 U.S.C. § 158(a)(1), (a)(3) [formerly NLRA § 8(1), (3)], (b)(1) and (b)(2).)

Central to the controversy here is our state Act's divergence from the federal model in setting forth what conduct of an employee may result in his or her forced discharge from employment under a valid union security agreement.

Ever since the Taft-Hartley Act amendments in 1947, forced discharge under the NLRA has been explicitly restricted to instances wherein an employee's union membership is denied or terminated for nonpayment of periodic dues or initiation fees. The beginning language of section 158(a)(3) (29 U.S.C.) reads essentially the same today as its predecessor section in

---

[10]Section 1154 states, in relevant part: "It shall be an unfair labor practice for a labor organization or its agents to do any of the following:

"(a) To restrain or coerce:

"(1) Agricultural employees in the exercise of the rights guaranteed in Section 1152. This paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein.

". . . . . . . . . . . . . . .

"(b) To cause or attempt to cause an agricultural employer to discriminate against an employee in violation of subdivision (c) of Section 1153, or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated for reasons other than failure to satisfy the membership requirements specified in subdivision (c) of Section 1153."

Petitioners Pasillas and Navarro both brought unfair labor charges against the Union (§ 1154, subds. (a)(1) and (b)), while only Pasillas brought charges against his employer (§ 1153, subds. (a) and (c)).

the Wagner Act of 1935. The section presently provides, in part, that it shall be an unfair labor practice for an employer, "by discrimination in regard to hire or tenure of employment or any term or condition of employment[,] to encourage or discourage membership in any labor organization: *Provided,* That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein . . . ." (Cf. 29 U.S.C. § 158(a)(3), with Act of July 5, 1935, ch. 372, § 8(3), 49 Stat. 452.) Thus, as originally enacted, the NLRA placed no express limits on use of the union security agreement.

The Wagner Act's provisions were reenacted in 1947 as part of the Taft-Hartley Act (see fn. 8, *ante*), and the union security section was thereby amended in an effort by Congress to cure serious abuses of union security arrangements—particularly the closed shop. (*Labor Board* v. *General Motors* (1963) 373 U.S. 734, 738-741 [10 L.Ed.2d 670, 673-675, 83 S.Ct. 1453].) The amendments abolished the closed shop by extending the section's original proviso so that an employee could satisfy the union membership condition imposed by a union security agreement by becoming a member of the union "on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, . . ." (29 U.S.C. § 158(a)(3).) More important to our discussion, however, was the addition of a further proviso, "That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that *membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required* as a condition of acquiring or retaining membership."[11] (*Ibid.*; italics added.)

The practical effect of the Taft-Hartley amendments was to make "significant alterations in the meaning of 'membership' for the purposes of union-security contracts. . . . It is permissible to condition employment upon membership, but membership, insofar as it has significance to employment rights, may in turn be conditioned only upon payment of fees and dues. 'Membership' as a condition of employment is whittled down to its

---

[11]Reflecting that newly imposed restriction, the Taft-Hartley Act also made it an unfair labor practice for a union "to cause or attempt to cause an employer to discriminate against an employee in violation of [§ 158(a)(3)] or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership; . . ." (29 U.S.C. § 158(b)(2).)

financial core. . . ." (*Labor Board* v. *General Motors, supra,* 373 U.S. 734, 742 [10 L.Ed.2d 670, 676].) Thus the amendments "were designed to allow employees to freely exercise their right to join unions, be good, bad, or indifferent members, or abstain from joining any union without imperiling their livelihood. . . . Congress intended to prevent utilization of union security agreements for any purpose other than to compel payment of union dues and fees. . . ." (*Radio Officers* v. *Labor Board* (1954) 347 U.S. 17, 40-41 [98 L.Ed. 455, 477, 74 S.Ct. 323]; *Labor Board* v. *General Motors, supra,* 373 U.S. at pp. 740-741 [10 L.Ed.2d at p. 675].)

In contrast, our Legislature departed from the federal act's example, preferring the following limitation on "membership" for purposes of union security agreements: "For purposes of this chapter, membership shall mean the satisfaction of all reasonable terms and conditions uniformly applicable to other members in good standing; provided, that such membership shall not be denied or terminated except in compliance with a constitution or bylaws which afford full and fair rights to speech, assembly, and equal voting and membership privileges for all members, and which contain adequate procedures to assure due process to members and applicants for membership." (§ 1153, subd. (c).)

## II

■ We decide first the question of whether the union security provisions utilized in these cases were properly given what the parties term "retroactive" effect. Each of the disciplined workers herein was expelled or suspended for alleged strikebreaking activities occurring during a hiatus between valid collective bargaining agreements, when no union security provisions were in force. The Union then compelled each of their discharges for "bad standing" after newly negotiated collective bargaining agreements containing union security provisions went into effect. Pasillas argued before the Board that this "retroactive" application of a union security provision is improper, but the Board did not address the issue in its decision and thus impliedly decided the issue against him.

■ ■ Pasillas, joined in argument by Navarro,[12] contends that retroactive application violates the Act, conflicts with controlling federal

---

[12]Although Navarro did not herself raise this argument before the Board, we can conceive of no unfairness to either the Board or the UFW in allowing her to now raise the point. It is undisputed that both petitioners' strikebreaking activities occurred when no union security agreement was in force. The issue thus presents a pure question of law—one which the Board and UFW have fully addressed.

We explain here our reasons for denying a motion to dismiss brought by the Board. The Board moved to dismiss the petition of Navarro, arguing that, because the Board afforded her relief by way of retroactive reinstatement to membership and employment plus make-whole remedies for all economic losses, she was not a "person aggrieved" by the Board's

precedent and, as an "ex post facto" deprivation of statutory rights, impermissibly abridges a worker's fundamental right to pursue a livelihood and violates substantive due process rights. The Board and the UFW strenuously argue that the wording and legislative history of the Act dictate a departure from federal Act precedent and mandate retroactive enforcement of all union security provisions.

■■■ We conclude that the provisions here at issue were correctly applied although, as will appear, we are not entirely in accord with the position of the Board and Union.

The language of the Act is neutral. It neither requires nor forbids retroactive application. Section 1152 grants the right to refrain from organizational activities "except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of continued employment as authorized in subdivision (c) of Section 1153." While a section 1153-authorized agreement is clearly the only permitted intrusion on an employee's right to refrain (cf. *Radio Officers* v. *Labor Board, supra,* 347 U.S. 17, 41-42 [98 L.Ed. 455, 478]; but see *N. L. R. B.* v. *International Union, United A., A. & A. I. Wkrs.* (1st Cir. 1963) 320

order within the meaning of section 1160.8 of the Act and hence lacked standing to petition for review. We denied the motion.

Section 1160.8 begins: "Any person aggrieved by the final order of the board *granting or denying in whole or in part the relief sought* may obtain a review of such order in the court of appeal . . . ." (Italics added.) We find that Navarro was aggrieved by the Board having denied, in part, the relief she sought.

In her brief to the Board, Navarro contended that (1) she was denied due process by the Union's failure to abide by its 60-day filing rule, (2) she should be excused from having to exhaust internal union procedures, and (3) she was denied state and federal constitutional rights by having to maintain "formal membership" in the Union and to honor its strikes. While the Board found in her favor on the exhaustion and due process arguments and was thus able to fully restore her former status and remedy her losses without reaching her third contention, she was denied a further remedy which the Board could not furnish by the adjudicative path it traveled. Beyond the relief that she ultimately obtained, Navarro sought to secure a judicially enforceable cease-and-desist order tailored to prevent a repeat of the forced discharge she experienced. Moreover, denial of such additional relief—which is easily enforced (§ 1160.8)—would necessitate the burden of further proceedings to later adjudicate her claim.

Although we find no state court decision interpreting the "person aggrieved" language of section 1160.8, the identical language in the federal counterpart, NLRA section 10(f) (29 U.S.C. § 160(f)), has been construed in accord with our conclusion. In *Truck Drivers and Helpers Local No. 728* v. *N. L. R. B.* (D.C. Cir. 1967) 386 F.2d 643, the union had sought injunctive relief to prohibit discrimination in regard to hire or tenure in violation of NLRA section 8(a)(3) (29 U.S.C. § 158(a)(3)), but the NLRB did not consider the issue, on the ground that it was affording relief under NLRA section 8(a)(1). In passing on an intervener's motion to dismiss the union's petition, the circuit court stated: "We do not consider whether on the merits this disposition [of the request for injunctive relief] was within the Board's discretion. Plainly the motion to dismiss . . . must be denied since the *failure of the Board to grant the additional relief sought* renders the Union a 'person aggrieved' within the meaning of [NLRA] § 10(f) . . . ." (Italics added; 386 F.2d at p. 644.)

F.2d 12, 15-16 [a union's constitution and bylaws may to some extent circumscribe the right, irrespective of the existence of a union security agreement]), the language of section 1152 just quoted does not limit the scope of such an agreement except in its cross-reference to section 1153.

Nor is the answer to retroactivity found in the guiding words of subdivision (c) of section 1153, defining an authorized agreement as one which may "require as a condition of employment [union membership], on or after the fifth day following the beginning of such employment, or the effective date of such agreement whichever is later, . . ." That language clarifies that continued employment may be conditioned upon union membership no earlier than five days after the agreement takes effect, but it does not indicate whether the required membership may be denied a then-current member for conduct predating the agreement.[13] Subdivision (c)'s limiting definition of "membership" as "the satisfaction of all reasonable terms and conditions uniformly applicable to other members in good standing . . ." is equally unhelpful for it does not indicate whether the terms and conditions of which it speaks must be satisfied only after the agreement comes into existence.

We therefore conclude that the *terms* of the Act do not require or forbid retroactive application. ██ ██ Before asking whether any *policy* of the Act was offended in these cases by retroactive application, however, we first must examine the language of the union security provisions here in question to determine whether they are susceptible of the retroactive construction impliedly given them by the Board. (Cf. *Colonie Fibre Co.* v. *National Labor Relations Board* (2d Cir. 1947) 163 F.2d 65, 67 & fn. 1, 69-70.)

The identical operative language is found in all three union security provisions utilized in these cases: "Any worker . . . who has been determined to be in bad standing by the Union pursuant to the provisions of the Union's constitution, shall be immediately discharged or suspended upon written notice from the Union to the Company, . . ." Key here are the words "*has been* determined to be in bad standing" (italics added), for they connote past discipline and, necessarily, past conduct. This use of the past tense is

---

[13]Of course, a union's constitution and bylaws will contain time limitations governing the bringing of charges against a member. (See, e.g., UFW Const., art. XVIII, § 4.) The constitution and bylaws of a union, constituting a binding contract with the members as to the union's authority to discipline and expel or suspend a member (*De Mille* v. *American Fed. of Radio Artists* (1947) 31 Cal.2d 139, 146 [187 P.2d 769, 175 A.L.R.382], cert. den. (1948) 333 U.S. 876 [92 L.Ed.1152, 68 S.Ct. 906]; *Posner* v. *Utility Union Workers of America* (1975) 47 Cal.App.3d 970, 974 [121 Cal.Rptr. 423]), will in that way impose a contractual limitation—independent of the Act—in the case of a member who has acted to jeopardize, but who has not yet lost, his or her good standing by the signing date of a security agreement.

in contrast with the wording of the two preceding conditions: "Any worker who *fails* to become a member . . . , or who *fails* to pay the required initiation fee, periodic dues or regularly authorized assessments . . . ." (See fn. 3, *ante,* for full text.) In view of this parallel construction, it is reasonable to assume that, if the "bad standing" clause had been meant to operate only prospectively, it would have read, "Any worker . . . who *is* determined to be in bad standing . . ." shall be discharged or suspended upon request, and even that wording would leave open the possibility that the *conduct* for which a member is disciplined, as opposed to the imposition of discipline itself, could predate the signing date of the agreement. Therefore, the intention of the parties to the agreement to allow retroactive application appears clearly from the language of the instrument itself and its clauses taken as a whole. (Civ. Code, §§ 1636-1639, 1641.) No resort to further constructional aids is appropriate. (Civ. Code, §§ 1639, 1649.)

In conclusion, although we are not bound under these circumstances by the Board's implied interpretation (cf. *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839]), we agree as a matter of law with the retroactive interpretation placed on the union security provisions.

■ The remaining question is this: Did retroactive application in this case, something which the literal terms of both the Act and the provisions allowed, nevertheless offend against a legislative policy inherent in the Act? We conclude that it did not.

■ Pasillas and Navarro rely on long-settled federal precedent holding that retroactive application of a union security agreement to, in effect, require an employee to pay periodic dues or initiation fees for periods predating the signing of that agreement (and when no other such agreement was in effect) violates the terms and policy of the NLRA. The federal circuit courts have consistently found that discharges or threats of discharges under such circumstances constitute unfair labor practices whether brought about by union or employer. (See, e.g., *N. L. R. B.* v. *International Union, United A., A., A. Imp. Wkrs.* (1st Cir. 1961) 297 F.2d 272, 274-275 [union]; *N. L. R. B.* v. *Spector Freight System, Inc.* (8th Cir. 1960) 273 F.2d 272, 276-278 [union and employer], cert. den., 362 U.S. 962 [4 L.Ed.2d 877, 80 S.Ct. 879]; *National Labor Relations Bd.* v. *International Ass'n* (9th Cir. 1953) 203 F.2d 173, 174-175, 177 [union]; *National Labor Relations Bd.* v. *International Union* (7th Cir. 1952) 194 F.2d 698, 701-702 [union]; *Colonie Fibre Co.* v. *National Labor Relations Board, supra,* 163 F.2d 65, 67-70 [employer]; see also *Industrial Union of Marine & Shipbuilding Wkrs.* v. *N. L. R. B.* (3d Cir. 1963) 320 F.2d 615, 619 [no employer violation in discontinuing enforcement of union shop and dues

checkoff where agreement had expired], cert. den. (1964) 375 U.S. 984 [11 L.Ed.2d 472, 84 S.Ct. 516], *sub nom. Bethlehem Steel Co.* v. *National Labor Relations Board.*) They urge that those cases are "applicable [NLRA] precedents" within the meaning of section 1148 of our Act and hence must be followed. However, we find that the federal precedents conflict with the evident legislative intent behind our state Act and that, on the facts before us, no labor policy of our state was violated by retroactive application.

The rationale supporting the federal rule against retroactivity finds perhaps its clearest expression in an early case, *Colonie Fibre Co.* v. *National Labor Relations Board, supra,* 163 F.2d 65.[14] Two employees in *Colonie Fibre* were discharged at the request of the American Federation of Labor (AFL) shortly after the signing of a new contract with their employer containing a union security maintenance-of-membership agreement. They had both been AFL members during a prior AFL contract also containing a maintenance-of-membership agreement, but had ceased paying AFL dues toward the end of that contract's term and had joined and begun organizing for the rival Congress of Industrial Organizations (CIO), openly identifying themselves as CIO supporters and soliciting CIO membership from among their coemployees at work. The old contract then expired without a new one being signed, negotiations having been forestalled by a pending CIO-backed petition for investigation and certification of representatives filed as the result of the two employees' efforts. After the ensuing election resulted in recertification of the AFL, the new contract was entered into amidst AFL and employer complaints about the two CIO members. The AFL then demanded and obtained the company's discharge of the two employees under the newly effected security agreement because of their CIO activities and their failure to pay past AFL dues over the interim period when no contract was in force. (163 F.2d at pp. 65-67.)

On those facts, the Second Circuit in *Colonie Fibre* agreed with the conclusion of the NLRB that the retroactive maintenance-of-membership feature of the union security agreement rendered it invalid as being beyond the authorization of section 8(3) (now part of § 8(a)(3)) of the federal act (see fn. 14, *ante*). (163 F.2d at pp. 67, 70.) The court quoted at length from, and apparently adopted, the NLRB's reasoning that retroactive application in that case was inconsistent with both the terms of the act and its policy of promoting free self-organization. (*Id.,* at p. 67.) The Board had relied on

[14]Although *Colonie Fibre,* a 1947 decision, dealt with pre-Taft-Hartley Act events and law, post-Taft-Hartley decisions have found no basis in congressional intent for applying a different rule. (See, e.g., *National Labor Relations Bd.* v. *International Union, supra,* 194 F.2d 698, 701-702, following *Colonie Fibre* and concluding that neither section 8(3) of the original federal act nor section 8(a)(3) of the amended act sanctioned retroactive application of a union security agreement.)

language in *Labor Board* v. *Electric Cleaner Co.* (1942) 315 U.S. 685 [86 L.Ed.1120, 62 S.Ct. 846], in "literally" construing section 8(3)'s proviso (now the first proviso of the amended section) as permitting only " 'contracts which require membership *during their term* . . .' " and hence as not sanctioning. " 'contracts which require *past* membership . . . .' " (*Colonie Fibre, supra,* 163 F.2d at p. 67.)[15] Thus, it reasoned, to require past dues was to require past membership in violation of the NLRA's terms. (Pp. 67-68.) Next, the Board found as a matter of NLRA policy that " '[a]pproval of a contract which made it possible for the contracting union to require payment of past dues as a condition of future employment would have a seriously detrimental effect upon freedom of organization,' " a goal of the federal act. (P. 68.) " '[I]n actual practice,' " the board observed, " 'the employee's right to support and select the bargaining representative he wanted would largely be reduced to the right to guess which of two or more competing unions would ultimately be chosen by the majority. Thus, approval of the contract before us would substantially impair freedom of choice at a time when the statute requires such freedom [i.e., during an election campaign between contracts]. To permit this impairment would make it difficult for advocates of a change in representation to present their case to their fellow employees.' " (*Ibid.*)

In contrast with the result and reasoning in *Colonie Fibre,* we feel compelled by our state Act's distinctive legislative history and treatment of union security to reject the federal rule insofar as it flatly forbids, as a matter of statutory construction, all retroactive application of union security devices. The federal precedent relied on by Pasillas and Navarro is to that extent inapplicable and not to be followed. (§ 1148.) We further conclude, on the facts before us, that retroactive application did not substantially impair protected associational activities of Pasillas or Navarro.

 Addressing first the right of Pasillas and Navarro to refrain from associational activities (§ 1152), there is simply no record evidence that either worker's strikebreaking was motivated by a desire to organize on behalf of a rival labor organization or even to protest the UFW's position as their certified union, and neither worker attempted to resign his or her membership at any time before or during the strikes. Their discharges therefore cannot be in any way attributed to an improper retaliatory purpose by

---

[15]The Supreme Court in *Labor Board* v. *Electric Cleaner Co., supra,* was actually interpreting NLRA section 8(3)'s specific proviso language allowing an employer to make "an agreement with a labor organization (*not established, or assisted by any action defined in this Act as an unfair labor practice*)" (italics added) when it observed, in language relied on by the board in *Colonie Fibre:* "These words of exception must have been carefully chosen to express the precise nature and limits of permissible employer activity in union organization. . . ." (315 U.S. 685, 695 [86 L.Ed.1120, 1127, 62 S.Ct. 846].)

their union or employers that might offend principles of free self-organization, a concern which permeates many of the federal cases. (See, e.g., *N. L. R. B.* v. *International Union, United A., A., A. Imp. Wkrs., supra,* 297 F.2d 272, 273 [employees discharged following a close election had formed an antiunion committee and resigned from the union during a hiatus between contracts]; *National Labor Relations Bd.* v. *International Ass'n, supra,* 203 F.2d 173, 174-175 [discharged employees had campaigned before and after expiration of a prior contract to oust the union as the employees' representative and were later expelled from membership on charges of "dual unionism"]; *Colonie Fibre Co.* v. *National Labor Relations Board, supra,* 163 F.2d 65, 66-67 [also involving "dual unionism" charges following organizational activity].) The financial hardships of prolonged concerted efforts such as the 1979 strikes shown here are, of course, potentially devastating to all members. However, we are confident that section 1152 was not designed to allow a member to freely disassociate from a collective strike effort based on financial hardship alone. Such a result would give every member an unassailable "right to refrain" and effectively undermine a union's power at a critical time in its representative capacity. Neither Pasillas nor Navarro opposed their strikes in principle. The interests which they assert are purely financial.

■ Absent demonstrated and substantial infringement of associational rights which the Act is designed to protect, we must respect "the power in the chosen union to protect against erosion its status . . . through reasonable discipline of members who violate rules and regulations governing membership. That power is particularly vital when the members engage in strikes. The economic strike against the employer is the ultimate weapon in labor's arsenal for achieving agreement upon its terms, and '[t]he power to fine or expel strikebreakers is essential if the union is to be an effective bargaining agent . . . .'" (*NLRB* v. *Allis-Chalmers Mfg. Co.* (1967) 388 U.S. 175, 181, fns. omitted [18 L.Ed.2d 1123, 1128, 8 S.Ct. 2001]; cf. *Machinists Local 1327* v. *N.L.R.B.* (9th Cir. 1984) 725 F.2d 1212, 1218.) Under the ALRA, a union's vital power to expel a strikebreaker carries with it the power to later force the strikebreaker's discharge under an authorized union security provision. This is an easily foreseeable consequence under the statutory scheme which was plainly anticipated by the Legislature since our Act envisions possible discharge for strikebreaking, or for a host of other union rule violations, so long as that action is not arbitrarily or selectively taken and fairness attends the disciplinary process. (§ 1153, subd. (c).)

■ Furthermore, although we have already noted that the Act's wording itself is neutral on the issue of retroactivity, committee debate in the California Legislature and the Act's expansive authorization of the union

security agreement device leads us to conclude that the framers of the Act specifically contemplated and accepted retroactive application as a permissible component of California agricultural labor policy.

In hearings before the Assembly Labor Relations Committee, Teamster Attorney Cross voiced concern that the wide latitude given a union through union security agreements might be misused by a victorious union, in the aftermath of a contest between rival unions, to exact reprisals against workers who had supported the losing union. "If . . . the [victorious] union were successful in getting the union security clause," he hypothesized, "the union could then turn around and exclude the people who worked or didn't support the boycott, who crossed the picket line and turn to the employer and say '[F]ire this man because he is no longer a member in good standing'. It's a novel proposition of the law and we feel that there should be language in the law which provides that no conduct which receives ["precedes" probably intended] the certification date should be a basis for expulsion from membership. . . ." (Hearing before Assem. Lab. Relations Com. on Assem. Bill No. 1533 (Reg. Sess., May 12, 1975) [hereinafter Assembly Committee Hearing] p. 41.) Although Mr. Cross' concerns centered on the kind of retaliatory, postcampaign tactics which we find lacking in the present cases, his example *assumed without dispute* retroactive application. No comment came in response to his assumption, and the proposed amendment found no support.

Aside from that legislative history, there is further circumstantial support for retroactivity in the operation of the statute. First, the NLRA's dues-and-fees limitation results naturally in a class of employees who have been expelled or suspended for nondischargeable grounds, and who are therefore not formal members in good standing yet are dues-paying "members" for purposes of retaining their jobs. The added distinctions in status arising from the operation of a nonretroactivity rule simply compound an existing NLRA phenomenon. The ALRA, on the other hand, equates bad standing with threat of discharge, subject of course to the safeguards of section 1153, subdivision (c), and there is therefore no phenomenon of dual membership status. To impose a rule of nonretroactivity onto the state scheme would introduce for the first time in California agriculture an area of uncertainty. This uncertainty would be greatly compounded under the state Act due to an agricultural worker's tendency to change employment seasonally and oftentimes to work for more than one employer at a time. Overlapping employment periods and frequent gaps between them, coupled with staggered expiration of collective bargaining agreements containing varying union security arrangements, would play havoc with an otherwise stable scheme. From this we further conclude that a rule of nonretroactivity was not envisioned for the ALRA.

Second, a discharged employee under the federal act can presumably effect his own reinstatement by paying back dues and fees, new initiation fees, etc., and in that way cure his bad standing. (Cf. *DeMille* v. *American Fed. of Radio Artists, supra,* 31 Cal.2d 139, 155.) However, an employee may lose good standing and be discharged under the ALRA on nonmonetary grounds which he or she is helpless to cure, and thus may have to ride out a specific term of suspension or an uncertain period of bad standing following outright expulsion. We do not think that our Act, which sanctions noncurable, set periods of bad standing and hence loss of employment, was intended to allow a discharged worker to avoid those results by shopping for an employer whose current union contract was, for example, fortuitously signed one week following the conduct which brought about the discipline.

In summary, we conclude that retroactive application of union security agreements in general is allowed though not required by the Act.[16] Because the particular union security provisions examined here allowed for retroactive application and because no countervailing associational rights were substantially impaired thereby, the provisions were properly given retroactive effect.[17]

### III

Pasillas and Navarro contend that section 1153, subdivision (c), of the Act, both by its enactment and in its application in the instant cases, impermissibly abridges their fundamental rights to free speech and association guaranteed them by the First and Fourteenth Amendments of the federal Constitution and by article I, sections 2 and 3, of the California Constitution. Section 1153, they argue, in authorizing union security agreements which require a worker to join and maintain membership in good standing in a union, is unconstitutional because it does not serve a compelling state interest by the least intrusive means available. Further, Pasillas maintains that the section's uniquely expansive authorization of the union security device in California agriculture, where workers are predominantly Mexican-American or of hispanic origin, violates the equal protection clause of the Fourteenth Amendment. The common starting point for these claims is the question of "state action." (*Lugar* v. *Edmondson Oil Co.* (1982) 457 U.S. 922, 936-937 [73 L.Ed.2d 482, 495, 102 S.Ct. 2744]; see *Rendell-*

---

[16]Because the Act itself does not, as the Union maintains, affirmatively require retroactive application, but rather leaves the matter preliminarily to the parties' contractual negotiations, we find no support for the constitutionally based claims of Pasillas and Navarro. (See discussion in part III, *post.*)

[17]We have analyzed this latter issue solely in terms of whether the Board properly gave effect to the provision because neither Pasillas nor Navarro based their unfair labor practice charges on retroactivity itself.

*Baker* v. *Kohn* (1982) 457 U.S. 830, 837 [73 L.Ed.2d 418, 425, 102 S.Ct. 2764].)[18]

Does the enactment or application of section 1153, subdivision (c), constitute state action? No reported decision has yet passed on the question. However, we are guided by federal decisions which have examined the issue of state action in the context of union security agreements authorized under the NLRA and the Railway Labor Act (RLA) (45 U.S.C. § 151 et seq.).

In *Railway Employees' Dept.* v. *Hanson* (1956) 351 U.S. 225 [100 L.Ed. 1112, 76 S.Ct. 714], the United States Supreme Court found state action in the operation of the RLA's provision authorizing union security agreements (45 U.S.C. § 152 Eleventh) and thereby reached state and federal constitutional questions in the case. The court observed that, while the RLA section did not compel but merely permitted union shop agreements, it specifically preempted state law, thereby conflicting with a state law in that case that would have invalidated the agreement. "If private rights are being invaded," the court reasoned, "it is by force of an agreement made pursuant to federal law which expressly declares that state law is superseded. [Citation.] In other words, the federal statute is the source of the power and authority by which any private rights are lost or sacrificed. [Citations.] The *enactment of the federal statute authorizing union shop agreements is the governmental action* on which the Constitution operates, though it takes a private agreement to invoke the federal sanction." (351 U.S. at p. 232 [100 L.Ed. at p. 249]; fn. omitted and italics added.)

In two subsequent cases, both involving employee challenges to the use of union dues collected from them under the same RLA provision at issue in *Hanson,* the Supreme Court grounded its decisions on a construction of the statute that forbids use of dues for political purposes which an employee opposes. (*Machinists* v. *Street* (1961) 367 U.S. 740, 768-769 [6 L.Ed.2d 1141, 1160-1161, 81 S.Ct. 1784]; *Railway Clerks* v. *Allen* (1963) 373 U.S. 113, 118 [10 L.Ed.2d 235, 239, 83 S.Ct. 1158].) Constitutional issues, and hence the question of state action, therefore did not arise.

Then, in *Abood* v. *Detroit Board of Education* (1977) 431 U.S. 209 [52 L.Ed.2d 261, 97 S.Ct. 1782], the Supreme Court was faced with challenges to the exaction and use of service charges (equivalent in amount to member

---

[18]For the sake of clarity and simplicity, we employ the term "state action" throughout this opinion to connote actions of either the state or federal governments.

We decline to address the issue raised by Pasillas that the ALRA's assertedly disparate impact on Mexican-American or hispanic workers also violates rights guaranteed under section 1981 of the United States Code, title 42. The issue is spuriously appended to his equal protection argument without any citation to authority.

dues) paid by nonmember employees pursuant to an agency shop arrangement authorized by a state statute allowing union representation of local government employees. (431 U.S. at pp. 212-215 [52 L.Ed.2d at pp. 269-271].) Relying on *Hanson* and *Street,* and drawing parallels between the operation and purposes of the state act and the RLA, the court upheld the validity of the agency shop arrangement itself and concluded that the union expenditures were valid for purposes related to the union's collective bargaining role but not for unrelated political purposes to which the employee objected. (*Id.,* at pp. 226-227, 233-237 [52 L.Ed.2d at pp. 278, 283-285].)

On the issue of state action, the *Abood* court noted that the affected employees worked directly for the state and that "the actions of public employers surely constitute 'state action,' . . ." In a footnote, the majority added this clarification of its position, quoting from and responding to remarks made by Justice Powell in his concurring opinion: "Nothing in our opinion embraces the 'premise that public employers are under no greater constitutional constraints than their counterparts in the private sector,' . . . or indicates that private collective-bargaining agreements are, without more, subject to constitutional constraints . . . . We compare the agency-shop agreement in this case to those executed under the Railway Labor Act simply because the existence of governmental action in both contexts requires analysis of the free expression question." (*Id.,* at p. 226, fn. 23 [52 L.Ed.2d at p. 279]; see conc. opn. of Powell, J., *id.,* at pp. 245, 252 [52 L.Ed.2d at pp. 290, 295].) By that footnote, the majority made it clear that state action in *Abood* was furnished by the actions of a public employer and not by reliance on any rationale of the RLA cases. The majority had emphasized in an earlier footnote that state action in the *Hanson* decision, *supra,* 351 U.S. 225, had depended on the RLA's preemption of contrary state law; it had further noted in passing that the NLRA, unlike the RLA, does not preempt state right-to-work laws but in fact expressly authorizes them. (P. 218, fn. 12 [52 L.Ed.2d at p. 273]; 29 U.S.C. § 164(b).)

Recently, the high court once more considered challenges to the use of dues compelled under an RLA-authorized union security agreement and, as in *Hanson,* had occasion to reach constitutional claims. In *Ellis* v. *Brotherhood of Railway, Airline and Steamship Clerks* (1984) — U.S. — [80 L.Ed.2d 428, 104 S.Ct. 1883], employees of a private airline argued that use of fees to finance various union expenditures was improper and that a union rebate program devised to protect the rights of protesting employees was deficient. The court agreed on the latter score (— U.S. at p. — [80 L.Ed.2d at p. 439]) and then examined each of the fee-funded union activities at issue, applying the statutory construction standard previously utilized in the post-*Hanson* cases of *Street* and *Allen* (both discussed *supra*). Finding that funding of three of the six activities was indeed authorized by the RLA,

the court subjected those expenditures to First Amendment scrutiny and upheld them. (*Id.*, at pp. ——— [80 L.Ed.2d at pp. 446-447].)

*Ellis* appears to pose conceptual difficulties as regards state action. The objecting employees there worked for a private rather than a state entity, and although the dispute arose under an RLA-authorized agreement which would have preempted any contrary state law, the case originated in California which, we are authorized to notice (Evid. Code, § 451, subd. (a)), has not enacted right-to-work legislation. Despite this theoretical problem (see discussion in *Wicks* v. *Southern Pacific Co.* (9th Cir. 1956) 231 F.2d 130, 135-137, cert. den., 351 U.S. 946 [100 L.Ed. 1471, 76 S.Ct. 845]), the practical answer appears to be that the state action issue was simply never raised or preserved for review. The Supreme Court opinion does not address it, and the decision below by the Ninth Circuit Court of Appeals seems to assume in a footnote, without analysis, that the *Hanson* decision is controlling on the point. (*Ellis* v. *Broth. of Ry., Airline & S. S. Clerks* (9th Cir. 1982) 685 F.2d 1065, 1067, fn. 1.)

While the United States Supreme Court has not directly spoken on the state action question in the context of NLRA section 8(a)(3), the parallel provision to our Act's section 1153, subdivision (c), several federal circuit courts have specifically addressed the question and differed in their conclusions. In the most recent and by far most thorough analysis, the District of Columbia Circuit in *Kolinske* v. *Lubbers* (D.C. Cir. 1983) 712 F.2d 471, argued persuasively and concluded that an agency shop clause conditioning access to strike benefits on, among other things, participation in strike activities, did not constitute state action. Noting that "section 8(a)(3) of the NLRA at most merely authorizes the use of agency shop fees" and the "crucial distinction" that the NLRA, unlike the RLA, does not preempt state right-to-work laws, the court found no direct governmental involvement and thus distinguished the *Hanson* rationale. (712 F.2d at p. 476.) The *Kolinske* court next went on to distinguish the public employer rationale of *Abood*, since the actor in *Kolinske* was a private entity—a union. (Pp. 474, 476-477.) Finally, facing what it concluded was an open question requiring independent inquiry, the court exhaustively studied the various strands of state action doctrine, ultimately concluding that the indirect action of the government in authorizing union security provisions through the enactment of the NLRA did not sufficiently involve the government so as to trigger First Amendment scrutiny. (Pp. 477-480.)

In a much earlier case, the Tenth Circuit had reached the same result, even without the benefit of the Supreme Court's later decision in *Abood*. In *Reid* v. *McDonnell Douglas Corporation* (10th Cir. 1971) 443 F.2d 408, no state action was found in the compulsory exaction of agency fees from

nonmembers pursuant to an NLRA-based union security clause, and the constitutional claims of the plaintiff class, who objected to use of the fees for union political purposes, could not be reached. The RLA rationale was perceived as hinging on the preemption of state law and possibly on the comprehensive regulatory scheme evident in the RLA. As to the latter point, the court stated, "Whatever the wisdom of this reasoning for the [RLA], it has no applicability to the [NLRA]," concluding that "the policy with respect to union security agreements expressed in the NLRA is more neutral and permissive than the policy of the RLA." (443 F.2d at p. 410; see also *Peltzman* v. *Central Gulf Lines, Inc.* (2d Cir. 1974) 497 F.2d 332, 334 [summarily rejecting constitutional attacks on a union security clause under the NLRA], cert. den. (1976) 423 U.S. 1074 [47 L.Ed.2d 83, 96 S.Ct. 857].)

Standing against the *Kolinske* and *Reid* cases is the First Circuit decision in *Linscott* v. *Millers Falls Company* (1st Cir. 1971) 440 F.2d 14 (cert. den., 404 U.S. 872 [30 L.Ed.2d 116, 92 S.Ct. 77]), where a two-member majority of the court found state action in an NLRA-authorized union shop agreement entered into between a private employer and the union. The court was therefore able to reach the plaintiff's First Amendment claim that coerced payment of dues violated her right to free exercise of religion, a claim which the court ultimately rejected on the merits. (440 F.2d at pp. 17-18.) Dismissing the argument that *Hanson,* an RLA case, should be distinguished because of the preemption feature of that act, the majority reasoned that, by necessary implication from the RLA's preemption provision, "federal approval, and hence federal enforcement, will exist in those states that do not enact such a law. [Citations.]" (P. 17.) The concurring member in *Linscott,* who would have affirmed solely on the basis that there was no state action, argued forcefully that the NLRA provision (29 U.S.C. § 164(b)) allowing state right-to-work laws "is not only incapable by its terms of overriding any inconsistent state legislation but, unlike the [RLA] provision, represents a weakening rather than a strengthening of federal policy toward union shop. . . . [I]t would follow logically from a ruling that [the NLRA provision] constitutes federal support and authority for union shop that [its preenactment] Congressional silence also constituted federal support and authority. From that logical point it is but a short step to the conclusion that all Congressional silence constitutes endorsement or, put another way, that all federal inaction is really federal action." (*Id.,* conc. opn. of Coffin, J., at pp. 19-20.)

Two other circuit court opinions of approximately the same vintage as *Linscott* implicitly assume without discussion that state action exists in the NLRA context. (*Hammond* v. *United Papermakers & Paperworkers Union* (6th Cir. 1972) 462 F.2d 174, 175 [citing *Linscott*], cert. den., 409 U.S.

1028 [34 L.Ed.2d 322, 93 S.Ct. 464]; *Seay* v. *McDonnell Douglas Corporation* (9th Cir. 1970) 427 F.2d 996, 1003 [citing *Hanson*].) However, the issue appears not to have been disputed in either case.

We are satisfied, upon this survey of federal precedent, that the reasoning of the *Kolinske* and *Reid* decisions is sound and should be applied in analyzing our own Act. The *Linscott* majority opinion stands alone, in its finding of state action, among all circuit courts to have expressly considered the question in the NLRA context. To the extent that the *Linscott* majority relied on *Hanson* for its finding of state action, we are confident that a different conclusion would have been reached had that court had the benefit of the 1977 Supreme Court decision in *Abood,* which removed any doubt that the state action in *Hanson* depended on the preemptive feature of the RLA, a feature not found in the NLRA.[19] To the extent that the *Linscott* majority relied on the NLRA's antipreemption provision as an indicant of state action,[20] we are persuaded by the concurring opinion's argument that such inaction could not constitute action.

Bringing the principles of the federal decisions to bear on our state Act, we initially conclude that nothing in its provisions compels the use of union security agreements. Our Act, like the NLRA, is neutral in this respect and leaves the parties free to accept or reject such agreements. The Act carefully leaves that component of free choice intact in defining associational rights of employees (§ 1152), unlawful restraint or coercion of an employee's exercise of those rights (§§ 1152, 1153, subd. (a), 1154, subd. (a)(1)) and unlawful discrimination on the basis of union membership (§§ 1153, subd. (c), 1154, subd. (b)).

But does our Act, like the RLA, preempt a preexisting bar to the inclusion or enforcement of such agreements by authorizing them? We conclude not.

---

[19]In a recent case, involving an employee's federal constitutional challenge to his denial of formal union membership for his refusal to swear an oath, the First Circuit reexamined its *Linscott* decision. In *Hovan* v. *United Broth. of Carpenters & Joiners* (1st Cir. 1983) 704 F.2d 641, the court found no state action, distinguishing *Linscott* as involving a discharge under a union security agreement whereas the employee in *Hovan* merely sought to be allowed to attend union meetings and could not, under the NLRA, have suffered discharge for refusing to take the oath. (*Hovan, supra,* 704 F.2d at pp. 643-644.) On the basis of that distinction, apparently one of degree rather than principle, the court found no need to "call *Linscott* into question to conclude that no governmental action [was] present" in *Hovan.* (*Id.,* at p. 643.) However, after reconsidering its *Linscott* rationale in retrospect and in light of the *Abood* clarification (that *Hanson* depended on preemption for state action), the court observed, "[I]n *Linscott,* this court went beyond *Hanson* . . . ." (*Ibid.*)

[20]The NLRA provision (29 U.S.C. § 164(b)) reads: "Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."

No preexisting statute established such a bar, and the common law labor policy of California embraced a wide variety of union security agreements, including those calling for the closed or union shop. (*Messner* v. *Journeymen Barbers etc. International Union* (1960) 53 Cal.2d 873, 877-879, 882-883 [4 Cal.Rptr. 179, 351 P.2d 347]; *Petri Cleaners, Inc.* v. *Automotive Employees, etc., Local No. 88* (1960) 53 Cal.2d 455, 470-471 [2 Cal.Rptr. 470, 349 P.2d 76].) Suspension or expulsion under such agreements was permissible, subject to rudimentary due process requirements of notice and hearing in the case of discipline for charges other than nonpayment of dues and fees. (*DeMille* v. *American Fed. of Radio Artists, supra,* 31 Cal.2d 139, 154-155.) It was observed in *Gabaldon* v. *United Farm Workers Organizing Committee* (1973) 35 Cal.App.3d 757 [111 Cal.Rptr. 203] (cert. den. (1974) 416 U.S. 957 [40 L.Ed.2d 307, 94 S.Ct. 1972]), just two years before enactment of the ALRA, that "California has no statute or policy either requiring that collective bargaining agreements include union shop provisions or invalidating such agreements. . . ." (35 Cal.App.3d at p. 763.)

There being no element of compulsion in the Act favoring the use of union security agreements, the question becomes whether the Act's mere authorization and protection of them constitutes state action.

Helpful in this part of the analysis is *Gabaldon* v. *United Farm Workers Organizing Committee, supra,* 35 Cal.App.3d 757, for that case considered the question of whether, in a pre-ALRA setting, the actions of a union and an employer in entering into a union security agreement under which a worker charged with "antiunion activity" could be discharged at union request, constituted state action by virtue of California's (pre-ALRA) policy to encourage and protect union shop agreements. (35 Cal.App.3d 757, 760-761, 764.) Farm worker class action plaintiffs in *Gabaldon* sought damages and declaratory and injunctive relief in a suit against the union and 26 growers, alleging deprivation of numerous constitutional rights. (*Id.,* at pp. 759-762.) The appellate court found no state action, however, and therefore affirmed a judgment on the pleadings in the defendants' favor. (P. 768; in accord is the companion case in federal court, *Mendoza* v. *United Farm Workers Organization Committee* (9th Cir. 1973) 487 F.2d 311, 312, cert. den. (1974) 415 U.S. 918 [39 L.Ed.2d 472, 94 S.Ct. 1416].)

Plaintiff-appellants in *Gabaldon* argued that there was state action in California decisions upholding the validity of union security agreements, in decisions holding local right-to-work ordinances invalid as preempted by state statutes, and in Labor Code provisions which outlawed yellow-dog contracts, provided for enforcement of collective bargaining agreements, declared associational and self-organizational rights for workers and made

coercion of employees regarding union membership illegal. The Court of Appeal responded: "In our view . . . the state policy so announced and the case decisions referred to do not change the fundamental fact that California has taken no action to require the inclusion of a union shop provision in a collective bargaining agreement or to invalidate such a provision. A collective bargaining agreement without a union shop covenant is entitled to legal protection. The position of the state can best be characterized as one of benign neutrality in that labor and management are free from any hindrances upon opportunities to bargain collectively. The Legislature has in effect left the field unregulated, neither requiring nor prohibiting union shop provisions but lending its support and encouragement to collective bargaining agreements freely entered into and making them equally enforceable in the courts whether such agreements do or do not contain union shop provisions. Such passivity falls far short of the state action required to bring the federal constitutional protections into operation." (35 Cal.App.3d 757, 764-765.)

On the issue of whether preemptive state statutes invalidating local right-to-work ordinances created a *Hanson*-type state involvement, the *Gabaldon* court distinguished *Hanson,* in part, by this reasoning: "[T]he union shop has always been lawful in California and thus the enactment of the [complained of] Labor Code sections did not divert from the traditional policy of the state. [Citation.] Furthermore, the local right to work ordinances did not originate until well after the enactment of the controlling sections of the Labor Code, while in *Hanson* the right to work laws were enacted prior to the union shop provision of the [RLA] which was designed to supersede them. . . ." (P. 767.)

Pasillas and Navarro do not argue against the reasoning in *Gabaldon*; rather, they argue that subsequent enactment of the ALRA inaugurated a deeper involvement of the state into privately negotiated union security agreements which now sufficiently imbues those private actions with the imprimatur of the state to trigger constitutional scrutiny. We have to disagree.

California's previous position of "benign neutrality" regarding the freedom of labor and management to include or exclude union security agreements remains unchanged with the advent of the ALRA. Measuring the ALRA against the NLRA, Pasillas and Navarro would find an *increased* state involvement in our Act's rejection of the NLRA dues-and-fees limitation on discharges and its broad tolerance of discharges for suspensions and expulsions grounded on other disciplinary charges. (§ 1153, subd. (c).) However, in this regard the ALRA is no different from federal law under the original Wagner Act, which lacked the dues-and-fees limitation. The ALRA, by *not* imposing that limitation, thus constitutes *less* of a govern-

mental intrusion than its present day federal counterpart. Also, it must be remembered that Pasillas and Navarro, who belong to a class of workers (agricultural employees) not covered by the NLRA and its dues-and-fees limitation, would enjoy no greater protection against use of union security agreements if the ALRA were repealed or invalidated. In fact they would *lose* protections granted them under the Act which were traditionally unknown in the area of internal union discipline. (See discussion in part IV, *post.*) But more importantly, the state and federal differences in the permitted scope of union security operation once agreements are reached does not alter either act's passive neutrality regarding the freedom to include or exclude those agreements in the first place.

The Act similarly does not change prior law in its neutral enforcement of collective bargaining agreements. As before, enforcement is available whether or not they contain union security provisions. (§ 1165.)

The pre-ALRA reasoning of *Gabaldon* is, in our view, still valid. It was noted there that the Legislature had "in effect left the field unregulated, *neither requiring nor prohibiting* union shop provisions but *lending its support and encouragement* to collective bargaining agreements *freely entered* into and making them *equally enforceable*" regardless of the inclusion of union security provisions. (35 Cal.App.3d 757, 765; italics added.) In enacting the ALRA, however, the Legislature has essentially codified the state's previous policy as to union security agreements. As already noted, such agreements are still neither required nor prohibited, and collective bargaining agreements continue to be equally enforced, with or without them. The characteristics of support and encouragement and freedom of choice also remain evident not only in the operation of the Act, but also in the statement of policy found in section 1140.2. The state's policy under the Act is to "encourage and protect" the right of agricultural employees to, among other things, full freedom in "designation of representatives" and freedom to "negotiate the terms and conditions of their employment, . . ." (§ 1140.2.)

We hold that neither the inclusion of union security agreements authorized by the Act nor their enforcement against Pasillas and Navarro constituted state action; constitutional protections therefore did not attach.

We reach the same result notwithstanding reliance by Pasillas and Navarro on the rationale of *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458 [156 Cal.Rptr. 14, 595 P.2d 592], to support their argument that state action can be found under the California Constitution. Drawing in part upon an overview of federal labor cases including *Steele* v. *L. & N. R. Co.* (1944) 323 U.S. 192 [89 L.Ed. 173, 65 S.Ct. 226],

*Hanson* and *Abood,* the Supreme Court in *Gay Law Students* concluded that a public utility, by virtue of its state-protected monopoly status and quasi-government entity character, was prevented by our state's equal protection guarantee (Cal. Const., art. I, § 7, subd. (a)) from arbitrarily excluding homosexuals from employment opportunities. (*Gay Law Students, supra,* 24 Cal.3d at pp. 469-475.) Then, relying in part on a rule first articulated in this state in *James* v. *Marinship Corp.* (1944) 25 Cal.2d 721 [155 P.2d 329], that a labor union having attained a monopoly supply of labor owes similar but common-law-based obligations to refrain from arbitrary discrimination in choosing its members, the court found that the public utility's discriminatory employment practices also violated a statutory embodiment of those common law duties. (Pub. Util. Code, § 453, subd. (a); *Gay Law Students, supra,* at pp. 480-485.)[21]

The Board, which now takes the position that there is *no* state action, has itself relied on the *Gay Law Students* rationale to *find* state action in the operation of an Act-authorized union security agreement like the ones at issue here. (*J. Jesus R. Conchola* (1980) 6 A.L.R.B. No. 16, pp. 10-15.) It was made clear at oral argument, however, that the Board considers its decision in *Conchola* to have been "advisory" only.

We do not believe that *Gay Law Students* can be read for the broad proposition being urged here—that state action is present whenever a union enjoying "monopoly" status acts pursuant to a state-authorized union security agreement; the decision must be read in context, as addressing only the problem of *arbitrary discrimination* in employment (or membership) criteria affecting an individual's fundamental right to work. The "state action" found in that case was enough to trigger our state Constitution's equal protection guarantee, but the Supreme Court gave no indication in that case that the same threshold degree of governmental involvement would have sufficed as well for our state's free speech and associational guarantees.

---

[21]Justice Tobriner, writing for the court in *Gay Law Students,* reasoned: "In *Marinship* [a case challenging discrimination against blacks in union membership] our court emphatically rejected the suggestion that a union with a closed shop agreement could be equated with an ordinary private voluntary association. Chief Justice Gibson declared: 'Where a union has, as in this case, attained a monopoly of the supply of labor . . . such a union occupies a quasi public position similar to that of a public service business and it has certain corresponding obligations. It may no longer claim the same freedom from legal restraint enjoyed by golf clubs or fraternal associations. Its asserted right to choose its own members does not merely relate to social relations; it affects the fundamental right to work for a living.' (25 Cal.2d [721] 731.) [¶] As Chief Justice Gibson explained, a union's legal obligations under such circumstances flowed from the long-established common law doctrine [ . . . ] which prohibited the holder of monopoly power from using its power in an arbitrarily discriminatory fashion. . . ." (*Gay Law Students, supra,* 24 Cal.3d 458, 481-482, bracketed additions and deletions ours.)

The principal federal case relied upon in *Gay Law Students* similarly concerned arbitrary (i.e., racial) discrimination and was resolved by construing the RLA as demanding rights *coextensive* with federal equal protection, not by making the federal constitutional protection directly applicable. (*Steele v. L. & N. R. Co., supra,* 323 U.S. 192, 202 [89 L.Ed. 173, 183] [the RLA imposes upon the statutory representative of a craft at least as exacting a duty to protect equally the interests of the members of the craft as the Constitution imposes upon a legislature to give equal protection to the interests of those for whom it legislates].)

The *Marinship* strand of the *Gay Law Students* decision also imposed no further obligation on the public utility than to refrain from arbitrary discrimination. That common law duty arising out of "monopoly" concepts, moreover, cannot aid Pasillas or Navarro because they do not assert that the UFW's actions under the union security agreements here in question were arbitrary.

IV

■■■■ We next consider whether the Board abused its discretion in concluding that the UFW's rule requiring a member to respect its strikes and picket lines (see fn. 4, *ante*) was a "reasonable" term or condition within the meaning of section 1153, subdivision (c), and hence a permissible basis for Navarro's discharge.[22] For reasons which follow, we believe that the Board misconceived its role under the Act and therefore conducted an incomplete review of "reasonableness."

As discussed in part I of this opinion, the ALRA and NLRA approach the matter of union security in essentially the same manner, first guaranteeing broad rights to engage in or refrain from concerted organizational activity and then allowing authorized union security agreements to interfere with the "right to refrain." Next, both acts provide a grace period for satisfying membership requirements—30 days for the NLRA and 5 days for the ALRA.[23] (29 U.S.C. §§ 157, 158(a)(3); ALRA §§ 1152, 1153, subd. (c).)

The crucial point of departure is in each act's treatment of the concept of "membership" as such term is relevant to potential loss of employment. Section 158(a)(3) of the federal act states in its second proviso that no employer is justified in discriminating against an employee for nonmember-

---

[22]We consider this important issue even though it is merely one alternative basis upon which Navarro's petition could have been resolved. (See part VI of this opinion, *post.*)

[23]The shorter time period for the state Act was necessitated by the "transient, often short-term nature of agricultural employment . . . ." (Levy, *supra,* at p. 790.)

ship in a union if he has reasonable grounds for believing either that (1) "such membership was not available to the employee on the same terms and conditions generally applicable to other members" or that (2) "membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership; . . ." Section 1153, subdivision (c), of our state Act shares the NLRA's concern for uniform application of internal union rules, defining "membership" as the satisfaction of only "terms and conditions [which are] uniformly applicable to other members . . . ."

 However, there are fundamental differences between the NLRA and the ALRA treatment of union security. First, rather than limit discharges to dues-and-fees grounds, the ALRA sanctions discharge where loss of good standing is based on failure to satisfy "reasonable terms and conditions" of membership. Thus, violation of any uniformly applicable term or condition may result in loss of employment if that term or condition is "reasonable." The federal language does not contain a reasonableness requirement. Second, the following compound proviso is added to the ALRA. "[S]uch membership shall not be denied or terminated except in compliance with a constitution or bylaws which afford full and fair rights to speech, assembly, and equal voting and membership privileges for all members, and which contain adequate procedures to assure due process to members and applicants for membership." (§ 1153, subd. (c).)

The scheme of section 1153 may be summarized in this way. By going beyond the present federal dues-and-fees limitation, the ALRA creates a situation analogous to the closed shop under the pre-1947 Wagner Act. The union "uses its own membership standards as a basis on which to exclude [or terminate] men from employment." (*Wallace Corporation* v. *Labor Board* (1944) 323 U.S. 248, 268 [89 L.Ed.216, 233, 65 S.Ct. 238], dis. opn. of Jackson, J.) However, unlike the Wagner Act, which denied the NLRB "any power to supervise union membership or to deal with union practices, however unfair they may be to members [or] applicants, . . ." (*ibid.*), section 1153 bridles union membership standards with the requirement of reasonableness and grants the Board intrusive powers of review over internal disciplinary matters whenever the discipline results in loss of good standing and the concomitant threat of discharge under a union security agreement.[24]

---

[24]This supervisory power of the Board exists only where the ultimate sanctions of suspension or expulsion are imposed. Any disciplinary action short of that will not support loss of employment and hence Board review under section 1153, subdivision (c). Neither worker-petitioner in these cases disputes a union's right to impose those lesser disciplinary sanctions for strikebreaking. (*NLRB* v. *Allis-Chalmers Mfg. Co., supra,* 388 U.S. 175, 182-186 [18 L.Ed.2d 1123, 1129-1131, 87 S.Ct. 2001].)

The Board in the case before us examined the disciplinary proceedings for compliance with a union "constitution" affording "full and fair rights" and "adequate procedures to afford due process" to the workers, as the statute directs. That is, it reviewed the fairness of the proceedings by internal union standards.[25] What is disputed is the Board's finding of reasonableness.

The Board stated, "In this case, the question is whether the UFW's requirement regarding the honoring of picket lines and strikes is *reasonably related to a legitimate union interest that is germane to its role as collective bargaining representative*. We are convinced that the ability to enforce disciplinary rules during a strike is necessary for a union to be able to carry out its duties as the . . . employees' representative."[26] (Italics added; fns. omitted.) The standard employed (italicized above) was drawn from expressions in *Steelworkers* v. *Sadlowski* (1982) 457 U.S. 102, 121 [72 L.Ed.2d 707, 721, 102 S.Ct. 2339], and *Pinsker* v. *Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 558 [116 Cal.Rptr. 245, 526 P.2d 253]. Navarro contends, and we agree, that the Board's use of that standard, without further inquiry, was an abuse of discretion.

At issue in *Steelworkers* v. *Sadlowski* was the meaning of the term "reasonable" as used in section 101(a)(2) of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), commonly known as the Landrum-Griffin Act (29 U.S.C. § 401 et seq.). That section, part of the LMRDA's "Bill of Rights" for union members, grants enumerated freedoms of speech and assembly in internal union matters but, in a proviso, leaves unimpaired a union's right to adopt and enforce "reasonable rules" as to a member's responsibilities toward the union.[27] Noting that a union rule in *Sadlowski*

---

[25]Navarro took the position at oral argument that the "full and fair rights to speech, assembly, and equal voting and membership privileges" mentioned in the statute (§ 1153, subd. (c)) refer only to internal procedural fairness and not to limits on the reasonableness of a disciplinary charge itself. That position accords with the view of one commentator who was close to the act in its formation: "This provision appears to have been designed to encourage internal union democracy and to require that a labor organization negotiating union security agreements adhere to certain basic democratic principles." (Levy, *supra*, at p. 791; see mention of Mr. Levy's role in *Highland Ranch* v. *Agricultural Labor Relations Bd., supra*, 29 Cal.3d 848, 860.)

[26]This reasoning and conclusion, while stated in the initial decision in the consolidated cases of Pasillas, Martinez and Scarbrough, were evidently relied on in Navarro's case, issued the same day. Board member McCarthy, in his dissent, disagreed with both the standard of reasonableness employed by the majority and the conclusion reached. (See fn. 7, *ante*.)

[27]LMRDA section 101(a)(2) (29 U.S.C. § 411(a)(2)) provides: "Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reason-

prohibiting candidates for union office from accepting campaign contributions from nonmembers might interfere with rights which Congress intended to protect by the LMRDA, the United States Supreme Court nevertheless held the rule valid as "rationally related to a legitimate and protected [union] purpose, and thus . . . sheltered by the proviso to § 101(a)(2)." (457 U.S. 102, 121 [72 L.Ed.2d 707, 721].)

*Pinsker* v. *Pacific Coast Society of Orthodonists,* a California Supreme Court decision, involved the common law fair procedure right of an individual to be free of "arbitrary" rules of a private organization to which he or she belongs or aspires to belong. The standard announced in *Pinsker* was that enforcement of a rule would not be prohibited unless it was either "contrary to established policy" or "so 'patently arbitrary and unreasonable' as to be 'beyond the pale of the law.'" (12 Cal.3d 541, 558.) Under that standard, a rule not allowing an orthodontist to delegate his services or operations to one less qualified than himself where orthodontic competence was required was held reasonable. (*Id.,* at pp. 558-559.)

The Board, in finding the UFW requirement regarding the honoring of picket lines and strikes "reasonably related to a legitimate union interest," fulfilled only a portion of its obligation to determine reasonableness.[28] We hold that the Board must not only determine (1) whether the rule is reasonable in its relation to legitimate union goals and functions, but also (2) whether the application of the rule to impose the sanction of suspension or expulsion is reasonable in the particular case at hand after balancing union interests and the interests of the worker.

It is important to remember the severe consequences of a union rule violation under the ALRA. Unlike the federal act, the ALRA equates all loss of good standing with the threat of firing. Thus, violation of an internal union rule may result not only in loss or suspension of membership, the ultimate internal sanctions, but also in loss of employment, a potentially crippling external sanction. Depending upon the strength and success of the certified representative union at the time and the prevalence of union security provisions in its collective bargaining agreements, loss of employment

---

able rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations."

[28]We agree that the UFW's rule against strikebreaking and crossing picket lines is valid by the *Sadlowski/Pinsker* standard devised and applied by the Board, and we assume from lack of argument to the contrary that all parties herein agree that such an intrinsic standard of reasonableness must, as a threshold matter, be met.

and good standing could mean loss of a worker's fundamental right to work for a living. (Cf. *James* v. *Marinship Corp.*, *supra*, 25 Cal.2d 721, 731.)

Thus the context in which the word "reasonable" appears is particularly important, for it is found in a special definition of "membership" applicable only where loss of employment under a union security provision is at stake. The Board has authority under subdivision (c) to scrutinize union disciplinary proceedings *only* where loss of good standing has occurred. The Board's analogy to the situation under the LMRDA, as explored in the *Sadlowski* decision, for example, where review of disciplinary proceedings is available for lesser sanctions, is not persuasive. Loss of employment was not and could not have been at issue in *Sadlowski* because under the federal scheme firing could only occur for nonpayment of dues and fees, not for other rules violations. For that reason, too, the court in *Sadlowski* was able to announce a fixed holding of reasonableness applicable to all future cases in which the campaign contribution rule was at issue, without regard to possible factual variations. The hardship endured by candidates for union office, that is, denial of outside campaign contributions, would remain fairly constant from case to case and would never jeopardize rights enjoyed beyond the internal workings of the union itself. Neither the severe consequence of firing nor the variable hardships which the firing might entail were factors relevant to the definition of "reasonable."

Further, the context of the instant cases also makes resort to the *Pinsker* standard of arbitrariness insufficient alone. There would have been no need to insert the word "reasonable" in the statute if it was thought that common law notions of fair procedure would apply in any event. The word "reasonable" would therefore seem to go beyond the common law protections addressed in *Pinsker*.

The preenactment history of the ALRA also supports an expanded review for reasonableness. As originally drafted, the Act would have mirrored the dues-and-fees limitation of the NLRA. Its present union security language is the product of a compromise agreement between representatives of the UFW and various growers reached in early May of 1975, about one month before the legislation was signed into law. (Assembly Committee Hearing, *supra*, at pp. 4, 17, 37, 45; Author's Amend. to Sen. Bill No. 813 (1975-1976 Reg. Sess.) May 6, 1975; Author's Amend. to Assem. Bill No. 1533 (1975-1976 Reg. Sess.) May 5, 1975.) As part of those changes, the dues-and-fees limitation was dropped in favor of the open-ended "reasonable terms and conditions" language, and internal union disciplinary proceedings resulting in loss of good standing were made reviewable by the Board. In a public hearing before the Senate Industrial Relations Committee, then Secretary of Agriculture and Services (now Chief Justice) Rose Bird explained

the trade-off evident in subdivision (c): "[T]hat was part of the compromise, that if the labor organization wanted to have the economic power . . . they also had to give to the board the power to look into their internal organization and their internal workings *to insure that those were fair and comported with due process."* (Italics added.) (Hearing before Sen. Ind. Rel. Com. on Sen. Bill No. 1 (Third Ex. Sess., May 21, 1975 [hereinafter Senate Committee Hearing] p. 73.)

In response to strong criticism at the Senate committee hearing that the amended language left too little protection for workers disciplined on grounds other than nonpayment of dues and fees, Secretary Bird repeatedly emphasized that the Board's review powers would be exercised to insure fairness and due process, saying, "[T]he people who read this language and become concerned about the membership clause tend to fail to read the latter part of that because I think it is very important language, and it is new, and something that has never been done in any other legislation, . . . [¶] [That language] gives to the Board the power to look into the internal workings of every labor organization that files under this Act and has any kind of activity wherein there is a complaint lodged against the labor organization because they are asking one of their members to do something that does not comport with *fairness* and with *due process.* Now, that is a tremendous power that labor organizations traditionally have never been willing to give . . . to a board, . . ." (Senate Committee Hearing, *supra,* at p. 71; italics added.) Secretary Bird continued by way of a hypothetical: "[I]f there were an objection raised by a grower or a member of a labor organization, that the labor organization was not comporting with due process . . . the General Counsel would look into it and *the board would make a determination as to whether or not, in fact, it was fair.* So you have a tremendous power in here that you have given to the board *to insure that the labor organization acts fairly,* and I think in a lot a ways this amendment is an improvement upon the original bill." (*Id.,* at p. 74; italics added.)

It is clear to us that one purpose of the amendments to subdivision (c) of section 1153 was to give the Board power to oversee the substantive fairness of expulsions or suspensions, not simply to insure mechanical compliance with a union constitution or bylaws, as one reading of the literal language might suggest.[29] For example, the Board surely would not abdicate its re-

---

[29]At the Senate Committee hearing, Attorney Jordan Bloom illustrated how empty a protection mere adherence to a constitution and bylaws could be: "You can . . . have a labor organization that has all the due process in the world. They have votes; they have meetings; everyone gets to say what they want to say; they take a vote and they say that anyone [who] didn't go to the demonstration is not in good standing and he's out. The decision was arrived at in a democratic way, but why should the employer be told to fire that guy because he preferred to work?" (Senate Committee Hearing, *supra,* at pp. 74-75.)

view function if it found that the union's constitution or bylaws afforded little or no protections; it would impose those protections. Moreover, it is evident that the Board was meant to give meaning to the phrase "reasonable terms and conditions" on a case by case basis. Assemblyman Howard Berman, a coauthor of the legislation, clearly indicated that the Board must give life to the term "reasonable": "[W]hat is the reason why an employee under a union security agreement keeps up his membership dues? Well, presumably . . . he is afraid of losing his job if he doesn't maintain his membership. The Board under this law has the authority to determine whether the reason that an individual is expelled from his union is reasonable . . . ." (Hearing before Assem. Ways and Means Com. on Agri. Lab. Rel. Act (Third Ex. Sess., May 27, 1975) p. 21; cf. Levy, *supra,* at p. 791 ["The exact parameters of these 'membership requirements' will have to be decided by the ALRB."].) There was even some question in committee whether the Board would exercise its authority so as to sanction expulsion or suspension for other than dues-and-fees grounds.[30]

The foregoing history of the Act together with its actual language dictates our conclusion that terms and conditions of employment are not to be deemed "reasonable" merely by reference to the intrinsic standard employed in the instant cases. If the only inquiry were whether a rule is "reasonably related to a legitimate union interest that is germane to its role as a collective bargaining representative," then very few rules would be found unreasonable and the slightest legitimate union interest would always outweigh the worker's fundamental right to work for a living. This cannot have been the intent of the Act, as is evident from the concern expressed before and within the committees that considered the amendments.

We hold that, in cases of expulsion or suspension placed before the Board pursuant to section 1153, subdivision (c), review, an internal rule forming the basis for the underlying charge shall be deemed a "reasonable" term or condition of membership only if the Board determines (1) that the rule is reasonable in its relation to legitimate union goals and functions, and (2) that, after balancing union interests and the interests of the worker,

---

[30]"JORDAN BLOOM: Why should the board have the authority to sanction the discharging of an employee for some reason other than a failure to tender dues or initiation fees?

"SENATOR GREENE: How do you know the board is going to do that?

"JORDAN BLOOM: It has the authority to do that in this law.

"SENATOR GREENE: But how do you know that it is going to make its determination in that direction rather in some other?

"JORDAN BLOOM: Why should it even have the authority to make that determination? That's my point.

"SENATOR GREENE: Well, I can tell you why it should have the authority as one vote on the bill. Because we decided to give it to them." (Senate Committee Hearing, *supra,* at p. 77.)

application of the rule is reasonable in the particular case at hand. In determining that the rule is reasonable in its application, the Board must find that no less severe sanction than suspension or expulsion will, in that particular case and under the circumstances existing at the time of the disciplinary action, be effective to serve the union interests advanced by the rule.[31]

While the precise dimensions of the test must be left within the discretion of the Board, to be exercised in light of its evolving experience and expertise, the following nonexclusive factors should prove to have general relevance in the balance of the union's interests against the worker's rights. The union's interests might include, for example, the need for conformance with the rule, the importance of the goal which conformance serves, the threat to union solidarity posed by the violation, the frequency and seriousness of such violations in general and as to the particular worker, and the probable curative effect of lesser sanctions than expulsion or suspension. Factors affecting the worker's interests might include his or her ability to find other employment, financial or other hardship which might have prompted the worker to violate the rule, the worker's awareness of wrongdoing and willingness to abide by the rule in the future, his or her tenure or other interests in maintaining present employment and the number or frequency of past rules violations. Should the Board determine that the rule in its application is not "reasonable," it may find it appropriate to return the member to the union's disciplinary processes for imposition of a lesser sanction so as not to deprive the union of all recourse against the worker.

V

■■■ Impliedly conceding that the Board has discretion to determine when a member's failure to exhaust internal union review procedures will be excused, the Union contends that the Board abused that discretion in the case of Martinez by applying an assertedly inapposite test, culled from federal law, to excuse Martinez's failure to pursue an appeal to the PRB before filing charges under the ALRA.

■■■ As an extension of the doctrine of exhaustion of administrative remedies, which generally makes resort to administrative procedures a jurisdictional precondition to seeking relief in the courts, a union member must in the usual case avail himself of all appropriate intraunion remedies before seeking judicial relief. (*Holderby* v. *Internat. Union etc. Engrs.* (1955) 45 Cal.2d 843, 846 [291 P.2d 463].) ■■■ We hold that this prin-

---

[31]We emphasize that the test announced above is not the equivalent of a constitutional standard. Although the test requires examination of less restrictive alternatives, there is no requirement of a compelling union or governmental interest. (Cf. *Steelworkers* v. *Sadlowski, supra,* 457 U.S. 102, 111 [72 L.Ed.2d 707, 715].)

ciple similarly requires exhaustion of intraunion remedies before seeking administrative relief under the ALRA. The Board and the Union agree that such is the general rule.

Martinez appealed his trial action to the Union's NEB, obtaining a reduction of his expulsion to a one-year suspension, but did not pursue his further right of appeal to the PRB, the next and final intraunion review level. (See fn. 5, *ante.*)

 Applying a three-part test borrowed from the United States Supreme Court opinion in *Clayton* v. *Automobile Workers* (1981) 451 U.S. 679 [68 L.Ed.2d 538, 101 S.Ct. 2088],[32] the Board excused Martinez's failure to appeal to the PRB for the reason that the PRB could not have provided him an adequate remedy. The Union now strenuously argues that the *Clayton* case, dealing as it does with employee actions under section 301(a) of the Labor Management Relations Act (LMRA) (see fn. 32, *ante*), is grounded on policy considerations not present in the instant case and that the exhaustion exceptions there enumerated are for that reason inapplicable. The proper rule, urges the Union, is that expressed in *Holderby* v. *Internat. Union etc. Engrs., supra,* 45 Cal.2d 843, at page 847: "It is only when the organization violates its rules for appellate review or upon a showing that it would be futile to invoke them that the further pursuit of internal relief is excused."

We find it unnecessary to decide whether the full three-part *Clayton* test for excusing exhaustion applies to these proceedings, for the part of that test relied on by the Board—inadequacy of remedy—is also a firmly established exception to the exhaustion doctrine under *California* law. "It is settled that the rule requiring exhaustion of administrative remedies does not apply where an administrative remedy is unavailable [citation] or inadequate [citation]." (*Tiernan* v. *Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 217 [188 Cal.Rptr. 115, 655 P.2d 317], and cases cited; *Farmer* v. *City of Inglewood* (1982) 134 Cal.App.3d 130, 137 [185 Cal.Rptr. 9].) Thus, there was no abuse of discretion in selection of the standard.

---

[32]In the context of an employee action brought under LMRA section 301(a) (29 U.S.C. § 185(a)) for breach of a collective bargaining agreement, the court in *Clayton* stated: "[C]ourts have discretion to decide whether to require exhaustion of internal union procedures. In exercising this discretion, at least three factors should be relevant: first, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; second, whether *the internal union appeals procedures would be inadequate . . . to award him the full relief he seeks* under § 301; and third, whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim. If any of these factors are found to exist, the court may properly excuse the employee's failure to exhaust." (Italics added; *Clayton* v. *Automobile Workers, supra,* 451 U.S. 679, 689 [68 L.Ed.2d 538, 548-549].)

 Further, on the merits of the Board's application of the inadequacy exception to the facts of Martinez's case, we find no abuse of discretion. Under provisions of the UFW Constitution, Martinez's penalty of expulsion was automatically stayed pending his NEB appeal, but not pending a further appeal to the PRB. (See fn. 5, *ante.*) Thus, the NEB decision of January 2, 1980, rendered the then-reduced penalty of suspension effective immediately, and Martinez was accordingly discharged from his employment at Mann Packing on January 14, for being in "bad standing." His discharge was within the 15-day time period in which he could have appealed to the PRB. (UFW Const., art. XX, § 4(b).) Instead of invoking PRB review, however, Martinez immediately filed unfair labor practice charges against the Union and Mann Packing.

Like the Board, we conclude that once Martinez had been discharged, his PRB appeal remedy was no longer adequate to assure him full relief. Successful PRB review might have resulted in Martinez being ordered restored to union membership in good standing. However, as far as we are aware, nothing in the UFW Constitution or in the collective bargaining agreement with Mann Packing empowered the PRB to compel Mann Packing to reinstate him to his former job and seniority. Under those circumstances, while Mann packing might have *chosen* to so reinstate Martinez upon restoration of his good standing, only the Board could have *ensured* that remedy.

In an analogous case, *Tiernan v. Trustees of Cal. State University & Colleges, supra,* a university employee who had been denied reappointment filed a formal grievance in accordance with established internal procedures designed for the resolution of employee-university disputes but did not fully pursue those procedures before seeking writ of mandate relief in superior court. Her claims were based in part on the defendant trustees' alleged duty to adopt and follow regulations regarding notice of nonreappointment, as required by Education Code section 89534. (33 Cal.3d 211, 214-217.) The Supreme Court held that claims premised on the alleged statutory duty were not barred by the exhaustion doctrine because the rules governing the grievance procedures provided no avenue for advancing the contention. One rule placed matters which required rule formulation and adoption by the trustees beyond the scope of grievance resolution, and another rule specifically enjoined the grievance committee from recommending required changes in the trustees' rules and policies. In light of those rules, the court in *Tiernan* concluded that, insofar as the employee's action sought to compel the trustees to adopt the notice regulations, it was not barred; similarly, to the extent that she claimed "a right to reinstatement or back pay by virtue of the trustees' failure to adopt such regulations," her action was not barred. (*Id.,* at pp. 217-218.) "The doctrine of exhaustion of administrative rem-

edies does not require a litigant to present his or her claim to an administrative body powerless to grant relief." (*Id.,* at p. 218.)

We hold that the intraunion PRB appeal procedure was inadequate to afford the full relief sought by Martinez and, hence, that Martinez was properly excused from exhausting that procedure. We are not persuaded by the Union's argument that, because PRB relief had in the past sometimes resulted in an employer fully reinstating a member voluntarily, the PRB procedure was thereby rendered adequate for purposes of exhaustion. Martinez was not required to protract the hardship of his unemployment in reliance on the charity of his former employer.[33]

## VI

Like Martinez, Navarro was excused by the Board for her failure to pursue PRB review. The Union contends that the Board abused its discretion.

Navarro's union trial was held on October 1, 1980. Her November 11 appeal to the NEB was rejected as untimely because not taken within 15 days of the trial and, presumably, because a discretionary extension of the appeal time in "the interest of justice" was not found warranted.[34] Consequently, Navarro's two-year suspension was not stayed, and she was fired at the Union's request. Appeal to the PRB was not taken and, owing to the NEB's discretionary refusal to accept jurisdiction, was no doubt unavailable in any event. She filed unfair labor practice charges against the UFW but not against her employer.

Noting that the stipulated facts in Navarro's case showed a particularly egregious violation of her due process rights under the UFW Constitution and citing *Libutti* v. *Di Brizzi* (2d Cir. 1964) 337 F.2d 216, the Board held that Navarro's failure to exhaust internal remedies did not warrant deferring consideration of her case. It then found that strikebreaking charges had been preferred against her nearly a full year after her accuser became aware of her alleged offense—well beyond the applicable 60-day time limitation; that two extensions of time constitutionally authorized by UFW President Cesar

---

[33]Were the facts different, the PRB remedy might have been adequate—for example, had the Union agreed to forestall requesting dismissal pending PRB review.

[34]Article XX, section 1(b), of the UFW Constitution provides: "[W]ritten appeal [to the NEB] must be mailed to the Secretary-Treasurer within 15 days of the date of the trial. The 15-day time limit provided in this Section for filing appeals from the decisions of trial courts may be extended at the discretion of the National Executive Board, for a period not to exceed thirty (30) days, when the Board determines that such extension would serve the interest of justice; . . ."

Chavez (art. XVIII, § 8) affected only the time period for holding trials, not for preferring charges; and that the extensions came too late in any event.

We do not pass on the question whether the seriousness of an internal rule violation may alone justify excusing a member's failure to exhaust internal remedies. (Cf. *Libutti* v. *Di Brizzi, supra,* 337 F.2d 216, 219, [exhaustion not required where conceded facts show serious violation of a fundamental right], with *Holderby* v. *Internat. Union etc. Engrs., supra,* 45 Cal.2d 843, 847 [a violation of a union's own rules which inflicts the initial wrong furnishes no right for direct resort to the courts].)

Instead, we hold that under the circumstances of Navarro's having attempted to utilize internal procedures and the NEB's *discretionary* refusal to exercise jurisdiction in the face of an egregious internal rule violation affecting her due process rights, the Board's decision to excuse exhaustion was not an abuse of discretion. We note that the Union does not dispute the merits of the Board's due process ruling and thus apparently concedes that the strikebreaking charges were untimely filed. It would be ironic to allow the Union to strictly enforce its discretionary time limitation against a member whose rights it concededly violated by a far more lengthy and prejudicial delay.

## VII

Key to Pasillas' case, too, is the issue of failure to exhaust intraunion appeals procedures. Pasillas did not attend his union trial of October 2, 1979, despite notice. Further, he failed to avail himself of either NEB or PRB review, and there was consequently no stay of his disciplinary expulsion. He was discharged by his employer at union request on November 2d and thereafter filed unfair labor practice charges against his employer and the UFW. The Board found his failure to exhaust intraunion appeals procedures unexcused and accordingly dismissed his allegations from the consolidated complaint. ■ We find no abuse of discretion in that decision.

Pasillas does not contend that he had inadequate notice of the trial or appeal procedures but suggests that internal review would have been, first, futile because the union "controlled" the NEB and PRB and, second, inadequate because those review bodies lacked power to compel his employer to rehire him and thus remedy his discharge. However, he made no showing whatsoever that any of the NEB or PRB members were biased or had prejudged his case, and the successes of Scarbrough and Martinez belie any suggestion that the NEB would have been unreceptive to his claims as a matter of course. The cases cited by Pasillas are distinguishable on that

basis.[35] Further, Pasillas forgets that an NEB appeal would have automatically stayed his expulsion and prevented his discharge in the first place so that reinstatement to employment—a claimed inadequacy in the internal remedies—would have been unnecessary.

■ Next, Pasillas relies on case law and legislative intent regarding LMRDA section 101(a)(4),[36] and argues that its provisions should apply by virtue of what he terms the ALRA's command to follow applicable "federal precedents" (see § 1148). We reject the idea for two reasons. First, section 1148 of our Act speaks of "applicable precedents of the National Labor Relations Act, as amended," not of "federal precedent" in general. While certain provisions of the LMRDA effected amendments to sections of the LMRA, which comprises chapter 7 of title 29 of the United States Code (see 29 U.S.C. § 141(a)), the LMRDA provision here in question is found, not in chapter 7, but in chapter 11 (29 U.S.C. §§ 401-531). In short, the provision is not part of the NLRA (or LMRA) (see fn. 8, *ante*). Second, federal precedent as to LMRDA section 101(a)(4) would not be "applicable" in any event because our Act does not contain a parallel provision. Furthermore, our Act's policy favoring internal resolution of disciplinary disputes (see fn. 39, *post*) is most clearly evident in section 1153, subdivision (c), which, as has been discussed at length herein, is without parallel in the NLRA and which therefore demands an independent assessment of exhaustion policy.

Finally, the LMRDA does not by its own terms apply to agricultural employees. Pasillas argues that the LMRDA definition of "employee" (29 U.S.C. § 402(f)) which, unlike the parallel LMRA definition (29 U.S.C. § 152(3)), does not specifically exclude agricultural laborers, evinces a congressional intent to make provisions of the LMRDA applicable to employees covered by our state Act. However, it seems more likely that the

---

[35]See *Glover* v. *St. Louis-S. F. R. Co.* (1969) 393 U.S. 324, at pages 330 to 331 [21 L.Ed.2d 519, at page 524, 89 S.Ct. 548] (failure to fully exhaust contractual remedies excused as futile upon allegations that petitioners' bargaining representatives had contrived with employer to bar petitioners' promotions); *Steele* v. *L. & N. R. Co., supra*, 323 U.S. 192, at pages 205-207 [89 L.Ed. 173, at pages 184-186] (individual grievances brought by railroad employees against their representatives were judicially cognizable where administrative boards would entertain only union-brought (rather than individual) complaints, were chosen by respondent representatives, and had definitely ruled against the employees on the issue in dispute).

[36]LMRDA section 101(a)(4) (29 U.S.C. § 411(a)), part of the "Bill of Rights of Members of Labor Organizations" (29 U.S.C. §§ 411-415), states in pertinent part: "No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, . . . : *Provided,* That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof: . . ."

broader LMRDA definition was chosen to accommodate that act's intended coverage of employees under both the LMRA and the RLA. The LMRDA contains this statement: "The Congress . . . finds and declares that the enactment of this chapter is necessary to eliminate or prevent improper practices on the part of labor organizations, employers [etc.] which distort and defeat the policies of the Labor Management Relations Act, 1947, as amended, and the Railway Labor Act, as amended, . . ." (29 U.S.C. § 401(c).)

Even if the LMRDA did apply, it would not prevent the Board from requiring a member to exhaust reasonable internal procedures for up to four months. The LMRDA section which Pasillas seeks to invoke has been interpreted to allow an agency or court to, *in its discretion,* entertain an action or proceeding before four months time elapses, but not to prevent the agency or court from discretionarily requiring a member to exhaust internal union remedies of less than four months duration. (*NLRB* v. *Marine Workers* (1968) 391 U.S. 418, 426-428 [20 L.Ed.2d 706, 713-714, 88 S.Ct. 1717]; see fn. 36, *ante.*) Here the Board required Pasillas to exhaust his remedies and found that he had invoked none of them. No abuse of discretion would appear. Moreover, legislative history reveals that LMRDA section 101(a)(4) was not intended to invalidate state court decisions requiring exhaustion of internal remedies, so long as those requirements are reasonable. (*Id.,* at pp. 427-428 [20 L.Ed.2d at p. 714].) Therefore, the LMRDA is neither available nor helpful to Pasillas.

At oral argument, Pasillas asked that if exhaustion of intraunion remedies be held required, the holding be made to operate prospectively, out of fairness, since the Act nowhere expressly requires intraunion exhaustion. However, the rule we apply here is by no means new and should have been expected. The *Holderby* decision (discussed in part V of this opinion, *ante*) established the general rule back in 1955, and its holding—which was squarely applied in a labor union dispute setting—remains valid today.

We hold that Pasillas' charges were properly dismissed for failure to exhaust. His remaining contentions, while adopted by Navarro and for that reason discussed herein, are therefore unavailing as to himself.

### VIII

■ The UFW argues that there is insufficient evidence to support the Board's finding that Martinez was denied a fair hearing. The argument lacks merit.

Evidence in the form of Martinez's testimony clearly supports the Board's conclusion that he lacked a sufficient understanding of the trial processes to

defend himself and, in particular, to cross-examine witnesses against him. Although Martinez protested his innocence throughout and had indicated a desire to defend himself, his conduct at the trial and his recollections afterward show that he was unaware of or confused about his rights to call witnesses in his favor, to be represented by another member and to cross-examine witnesses against him.

The Union points to other evidence—that Martinez was informed of his rights to cross-examine witnesses, to invoke intraunion review and to have a coworker represent him—as undermining Martinez's "conveniently vague" memory on those points. However, Martinez's lack of understanding is not necessarily inconsistent with his having been mechanically informed of certain rights. The Board was entitled to give weight to Martinez's inability to read or write English, his virtual inability to read or write Spanish and the fact that he had completed just two years (or semesters) of school. Assertions by the Union that Martinez had a "conveniently vague" memory raise questions of credibility, as to which the Board's resolution is binding absent testimony which is incredible or inherently improbable. (*Montebello Rose Co.* v. *Agricultural Labor Relations Bd.* (1981) 119 Cal.App.3d 1, 20 [173 Cal.Rptr. 856].) The testimony here is not of that kind, and Martinez's self-interest in obtaining relief from the trial decision was simply a factor for the Board to consider in evaluating his testimony. (See *Martori Brothers Distributors* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 721, 728-729 [175 Cal.Rptr. 626, 631 P.2d 60].)

We hold that the Board's finding that Martinez lacked sufficient understanding of the trial procedures—a question of fact based on the resolution of conflicts in the evidence and on credibility determinations—is supported by substantial evidence on the record considered as a whole. The finding is therefore conclusive. (§ 1160.8; *Martori Brothers Distributors* v. *Agricultural Labor Relations Bd., supra,* 29 Cal.3d 721, 727-728.)

## IX

Lastly, the UFW challenges the Board's supplemental decision, by which Scarbrough's estate was ordered made whole for all losses suffered as the result of both his 1979 layoff *and* his 1980 discharge.[37] The Board had previously ordered allegations of Scarbrough's complaint relating to the 1980 discharge dismissed on the ground that the UFW had restored Scarbrough to good standing, had successfully requested his reinstatement to employment at Sun Harvest and had admitted its obligation to make Scar-

---

[37]The Union apparently does not dispute that part of the decision, carried over from the initial decision, that the 1979 layoff constituted a violation of the Act by the Union.

brough whole. However, upon reconsideration, the Board vacated its prior order and concluded that both the layoff and the later discharge constituted unlawful discrimination under section 1154, subdivision (b), of the Act. (See fn. 10, *ante.*) In doing so, the Board adopted the ALJ's findings with regard to both acts of discrimination, adding: "To the extent the ALJ's Decision is unclear, however, we find that the UFW conceded the lack of adequate due process at Scarbrough's trial in the decision of its [PRB]."

The UFW complains that the supplemental decision—in effect finding PRB relief inadequate after the Board had previously found the same relief adequate—shows, first, inconsistent application of the exhaustion doctrine and, second, unfair use of the PRB, intraunion remedy as proof of an unfair labor practice. This, it is claimed, subverts the purposes of the Act by discouraging union compliance with section 1153, subdivision (c), due process requirements.

We find no misapplication of the exhaustion doctrine or subversion of legislative purpose. In fact, the supplemental decision was issued by the Board in order to conform its action to the plain requirements of the Act. The Board had initially reasoned as follows: "Since the UFW concedes it is obligated to make Scarbrough whole for any losses he may have suffered as a result of his discharge, and since Scarbrough is free to seek judicial enforcement of that obligation, there is no need for this Board to maintain its jurisdiction over the matter." In this first decision, the Board in essence found an unfair labor practice in the 1980 discharge (as had the ALJ) but, out of deference to the Union's internal PRB processes, declined to issue a remedial order. However, as Scarbrough correctly pointed out in his motion for reconsideration, section 1160.3 of the Act does not give the Board the option of declining jurisdiction once it has found an unfair labor practice. In response to that argument, with which the ALRB General Counsel concurred, the Board conformed its disposition to the Act's directive by issuing a remedial order, thus retaining jurisdiction.

In mandatory language, section 1160.3 specifies two options open to the Board upon hearing allegations of an unfair labor practice. Upon finding an unfair labor practice by a preponderance of the testimony, the Board "*shall issue . . . an order* requiring [the violator] [1] to cease and desist from such unfair labor practice, [2] to take affirmative action, including reinstatement of employees with or without backpay, and making employees whole, when the board deems such relief appropriate, for the loss of pay resulting from the employer's refusal to bargain, and [3] to provide such other relief as will effectuate the policies of this part. . . ." (Italics and bracketed material added.) Upon finding no violation, the Board "shall issue an order dismissing the complaint. . . ." The section thus authorizes dismissal of a com-

plaint only where no violation is found; in all other cases, a remedial order must issue. This being the express language of the section, it follows that the Board did not abuse its discretion in vacating its prior disposition and issuing the remedial order. It would in fact have been an abuse of discretion and an abdication of statutory duty for the Board to have let the prior order stand.

Federal authority is in accord with this construction of the Act. The parallel provision of the federal Act, section 10(c) of the NLRA (29 U.S.C. § 160(c)),[38] has been held to require that the NLRB issue a remedial order— at the very minimum, a cease-and-desist order—once it has found a violation. (*International Union, U. A., A. & A. I., Wkrs. (UAW)* v. *N. L. R. B.* (6th Cir. 1970) 427 F.2d 1330, 1332-1334, and cases cited therein.)

We do not share the UFW's concern that the Board's issuance of remedial orders upon found unfair labor practices will discourage a union from providing effective review and remedies through its own internal mechanisms, a result which we agree would be at cross-purposes with the Act's evident policy of encouraging effective intraunion resolution of disciplinary disputes.[39] First, the prospect of avoiding the filing of charges under the Act will remain a constant impetus on both sides for seeking effective internal resolution of disputes. ██ Second, once the Board has jurisdiction and has found an unfair labor practice, its remedial order need not immediately direct all possible affirmative action but may, when appropriate, leave room for remedial measures already in progress while at the same time reserving jurisdiction should those measures fail.[40] This latter course is consistent

---

[38]Section 10(c) provides in pertinent part that, upon a finding of an unfair labor practice, the NLRB "shall issue . . . an order requiring [the violator] to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter: . . ." Upon finding no violation, the NLRB "shall issue an order dismissing the said complaint. . . ."

[39]As discussed earlier in this opinion, subdivision (c) of section 1153 of the Act vests the Board with uniquely intrusive powers to look into internal disciplinary proceedings to insure that a union affords workers facing denial or termination of membership "full and fair rights. to speech, assembly, and equal voting and membership privileges for all members" and "adequate procedures to assure due process" as guaranteed by a union's constitution and bylaws. The UFW Constitution's PRB and NEB review procedures are, of course, calculated to remedy any violations of member/applicant rights, albeit after the fact, and as such are consonant with the Act's policy and deserving of respect from the Board where those remedies are effective. Also, internal union relief which makes the filing of unfair labor practice charges unnecessary is consonant with the Board's power to command affirmative action, which power is remedial rather than punitive. (*Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 93 Cal.App.3d 922, 940 [156 Cal.Rptr. 152].)

[40]Section 1160.3 provides in part: "Until the record in a case shall have been filed in a court, as provided in this chapter, the board may, at any time upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it."

with the Board's responsibility to fashion relief which will, according to the directive of section 1160.3, "effectuate the policies" of the Act. (Cf. *Nish Noroian Farms* v. *Agricultural Labor Relations Bd.* (1984) 35 Cal.3d 726, 745 [201 Cal.Rptr. 1, 677 P.2d 1170].)

In the case of Scarbrough, the Board was advised by General Counsel that the issue of calculating backpay had resulted in impasse, with the UFW attributing delay to Scarbrough's refusal to cooperate. Scarbrough, on the other hand, expressed his preference for a Board-formulated backpay award. That state of events presumably persuaded the Board, upon reconsideration, to affirmatively order Scarbrough made whole in accordance with computations established by ALRB precedent. Because the PRB remedy no longer appeared fully effective, the Board's supplemental order was not at all in tension with the Act's policies.

Moreover, as a practical matter apart from the Board's statutory duty to issue a remedial order, it is important that the Board retain jurisdiction for enforcement and prevention purposes rather than relegating a successful charging party to civil court processes. It is preferable and in keeping with the legislative purpose for the Board to bring its expertise to bear on supervision problems.[41] Also, the existence of an enforceable cease-and-desist order is far more expeditious for a charging party than having to start over again should continued or renewed violations occur. (*International Union, U. A., A. & A. I., Wkrs. (UAW)* v. *N. L. R. B., supra,* 427 F.2d 1330, 1333-1334.)

Finally, the UFW has no reason to protest the Board's use of the internal PRB decision as a "concession" of due process violations regarding Scarbrough's 1980 discharge. The UFW never disputed the discharge before either the ALJ or the Board. Rather, it disputed only the 1979 layoff and argued that questions as to the legality of its actions toward Scarbrough were mooted by the subsequent PRB relief. The 1980 discharge question was thus not preserved for Board review or this court's review. (*Nish Noroian Farms* v. *Agricultural Relations Bd., supra,* 35 Cal.3d 726, 737, 743.) We interpret the Board's allusion to the issue being "conceded" as meaning only that the issue was not disputed beyond the PRB review stage.

### DISPOSITION

We have rejected all of the petitioners' contentions challenging the Board's actions as to Pasillas, Martinez and Scarbrough. Real parties in

---

[41]Section 1160.3 provides that where backpay is ordered, "[s]uch order may further require [the violating employer or union] to make reports from time to time showing the extent to which it has complied with the order. . . ."

interest Martinez and Scarbrough have not petitioned for review in their cases, petitioner Pasillas' failure to exhaust intraunion appeals procedures properly resulted in dismissal of his unfair labor practice allegations and petitioner UFW's challenges regarding all three of those parties lack merit. Accordingly, the order in 8 A.L.R.B. No. 103, as modified by the supplemental order in 9 A.L.R.B. No. 17, is ordered enforced in full. That part of the Board's decision in 8 A.L.R.B. No. 103, finding that the UFW rules here at issue were "reasonable" (a conclusion not challenged directly by Pasillas, but indirectly challenged by Navarro and apparently adopted and relied upon by the Board in Navarro's case), is disapproved insofar as it is inconsistent with this opinion.

The claims of Navarro concerning retroactive application of the union security provision and her free speech and association rights, as well as the UFW's exhaustion of remedies argument, all lack merit. To that extent, we agree with the Board's decision, although we have concluded that the Board misconceived the extent of its review function under section 1153, subdivision (c), of the Act and therefore never undertook to balance the need for the penalty of suspension. However, the Board's decision is upholdable on the basis of its due process ruling alone. The decision in 8 A.L.R.B. No. 104 is therefore affirmed, and the order is enforced in full.

Kline, P. J., and Rouse, J., concurred.

Petitions for a rehearing were denied June 20, 1984, and the applications of petitioners Pasillas and Navarro for a hearing by the Supreme Court were denied August 8, 1984. Bird, C. J., did not participate therein.